**Ex parte Ricky Dale HARMON, Applicant.**

No. 74432.

Court of Criminal Appeals of Texas.

Sept. 25, 2002.

Order Denying Rehearing Oct. 8, 2003.

L.T. Bradt, Houston, for Appellant.

Jeffrey L. Van Horn, First Asst. State Atty., Matthew Paul, State's Atty., Austin, for State.

### *OPINION*

PER CURIAM.

This is a post-conviction application for a writ of habeas corpus filed pursuant to Article 11.07, V.A.C.C.P. Applicant was convicted of aggravated sexual assault, and punishment, enhanced by a prior conviction, was assessed at thirty years' imprisonment. This conviction was affirmed, *Harmon v. State,* No. 07–94–107–CR (Tex.

App.-Amarillo, delivered April 5, 1996, no pet.).

Applicant contends that he is actually innocent, as demonstrated by the complainant's affidavit that her trial testimony was false and was prompted by her natural father's sister, and that Applicant never sexually assaulted her. The trial court has conducted a hearing and entered findings that the complainant's recantation is credible, and recommends that relief be granted. Applicant is entitled to relief.

Relief is granted. The judgment in cause number F94–00256–W in the 363rd Judicial District Court of Dallas County is set aside, and Applicant is remanded to the trial court to answer the charges against him.

WOMACK, J., dissents.

### ORDER ON STATE'S MOTION FOR REHEARING

PER CURIAM.

The State's motion for rehearing is denied. Our opinion on original submission is ordered published.

HERVEY, J., filed a dissenting opinion, in which KEASLER, J., joined.

KELLER, P.J., dissents.

HERVEY, J., filed a dissenting opinion to the denial of the State's Motion for Rehearing in which KEASLER, J., joined.

I respectfully dissent to the denial of rehearing. This is another *Elizondo* case in which applicant claims that the complainant's recantation of her trial testimony during a habeas corpus hearing unquestionably established applicant's innocence of an aggravated sexual assault of a child conviction. *See Ex parte Elizondo,* 947 S.W.2d 202, 205 (Tex.Cr.App.1996). On original submission, the Court remanded applicant to the trial court "to answer the charges against him" even though the Court decided that applicant unquestionably established his innocence of these charges. *Ex parte Harmon,* op. at 779 (Tx.Cr.App. No. 74,432, delivered September 25, 2002).

Applicant was convicted in 1994 in the 363rd District Court of Dallas County of aggravated sexual assault of his eight-year-old stepdaughter (the complainant). About nine years later, applicant filed this habeas corpus application in the same court with the same judge presiding. The habeas hearing, however, was conducted by a Magistrate and not by the 363rd District Court Judge. The Magistrate took "judicial notice" of the record from applicant's 1994 trial during the habeas hearing. There is nothing in the habeas record to indicate that the Magistrate actually read or considered any of the evidence from this record as required by *Elizondo* and our recent decision in *Ex parte Tuley* in which the habeas judge referred extensively to the evidence from the habeas corpus applicant's trial. *See Ex parte Tuley,* 109 S.W.3d 388, 396 (Tex. Cr.App., 2002) (op. on orig. submission).

Some time after the habeas hearing, the 363rd District Court Judge simply found, in relevant part, that "the [habeas corpus] testimony of [the complainant] is credible" even though there is nothing in the habeas record to indicate that the 363rd District Court Judge actually observed the complainant testify at the habeas hearing. Also, contrary to *Elizondo* and our recent decision in *Tuley,* there is nothing in the habeas record or in the 363rd District Court Judge's findings to indicate that the 363rd District Court Judge considered any of the evidence from applicant's 1994 trial. *Compare Tuley,* at 410–424 (setting out habeas court's extensive findings to support its conclusion that the complainant's

"recantation ... [was] more credible than the testimony at trial") and at 396 (the "convicting court, after weighing the evidence from the trial ... and the newly discovered evidence found the evidence of Applicant's guilt [was] so far outweighed by the evidence of Applicant's innocence as to be entirely one-sided") (internal quotes omitted). The 363rd District Court Judge recommended that applicant's conviction be set aside, and this Court's opinion on original submission simply followed that recommendation also without any consideration of the evidence from applicant's 1994 trial.[1]

*Elizondo*, however, requires courts (or at least the habeas court), in evaluating "actual innocence" claims, to compare and weigh the new evidence (presented on habeas corpus) against all "the evidence of guilt adduced at trial" to "assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole." *See Tuley*, at 397 (requiring convicting court to weigh "the evidence of the applicant's guilt against the new evidence of innocence"); *Elizondo*, 947 S.W.2d at 206. That procedure obviously was not followed in this case. At the very least, the State's motion for rehearing should be granted and this case should be remanded to the 363rd District Court to evaluate applicant's "actual innocence" claim in accordance with *Elizondo* and this Court's more recent decision in *Tuley*.

I would, however, deny habeas corpus relief based upon an independent examination by this Court of the evidence from applicant's 1994 trial and of his newly discovered evidence (i.e., the complainant's recantation). *See Elizondo*, 947 S.W.2d at

206; *Ex parte Tuley*, 109 S.W.3d 388, 395–396 (Tex.Cr.App., 2003) (Hervey, J., dissenting to denial of reh'g). The complainant testified at applicant's 1994 jury trial that applicant sexually assaulted her "a bunch of times." *See also Harmon v. State*, No. 07–94–0107–CR slip op. at 2–6, 6 (Tex.App.-Amarillo, delivered April 5, 1996) (nonpublished). Applicant was convicted by the jury which actually observed the complainant testify.[2]

The complainant claimed nine years later, however, at the habeas hearing, that her 1994 trial testimony was false and that her aunt (who did not testify at the habeas hearing) told her "what to say about the whole alleged event" so that the complainant's mother and biological father could get back together.

Q. In that [1994] trial you testified that [applicant] had done certain things to you specifically, that he had taken his clothes off, he had you take your clothes off, that he had gotten on top of you and that his penis had gone in and out. That's the shorthand rendition.

A. Yes.

Q. Do you remember that testimony?

A. Yes, I do.

Q. Did that happen?

A. No, it didn't.

Q. Have you read the testimony that was given by—I just drew a blank. Who is your aunt?

A. Barbara.

Q. —Barbara, okay, as far as statements that you supposedly made to her about stuff—

A. Did I read them.

Q. Yes.

---

1. When this Court handed down its opinion on original submission, the record from applicant's 1994 trial had not been included in the habeas record. The record from applicant's 1994 trial is here now.

2. In this case, therefore, the Court disregards the findings of the only factfinder that actually observed the complainant testify.

A. Yes, I did.

Q. Those statements about what you supposedly told your aunt, [Barbara], did you ever make those statements to her?

A. No, I didn't.

Q. How did you come to testify that [applicant] had sexually assaulted you?

A. I was told to say those things.

Q. By whom?

A. My Aunt Barbara.

Q. By Aunt Barbara, you're referring to [Barbara]?

A. [Barbara].

Q. Do you understand why you were supposed to say these things?

A. Do I understand?

Q. What is your understanding of why you were supposed to say that [applicant] had sexually assaulted you?

A. Because—so my dad and mom would get back together.

Q. And your dad is who?

A. [Kenneth].

Q. And your mother is?

A. [Brenda].

Q. Now, had your parents divorced?

A. Yes.

Q. How did you feel about that?

A. Well, I wanted them to get back together.

Q. Would it be fair to say that you were upset about the fact that they had divorced?

A. Yes, I was.

Q. Were you upset about the fact that your mother had a relationship with [applicant]?

A. Was I upset?

Q. At that time.

A. Yes.

Q. Okay. What did [aunt Barbara] tell you would happen if you said that [applicant] had had sex with you?

A. That [applicant] would be out of the picture and my mom and dad would get back together.

The evidence from the habeas hearing also showed that the complainant "change[d][her] story in this case" at around the time that she and her mother appeared on a nationally televised show about people who were "falsely convicted." The mother denied that they did this "to gain notoriety or national attention."

The evidence from applicant's 1994 trial also showed that the complainant testified in detail about a specific sexual assault that applicant committed against her in February 1993. *See Harmon,* slip op. at 3–4. The complainant testified that she and her brother were watching television while her mother was at work. *See id.* Applicant told the complainant to go into the bedroom where he sexually assaulted her. Applicant gave the complainant some money after the assault. The mother testified that she came home during this time and found the brother outside and the house locked which she considered unusual because the door was usually unlocked. *See id.* The mother found the complainant and applicant alone in the house. *See id.* The mother later noticed that the complainant had extra money. *See id.*

The complainant never claimed at the habeas hearing that her mother did not find her and applicant alone in the house at this time or that she did not have extra money that day. The mother reaffirmed most of her trial testimony at the habeas hearing with the exception that she could not recall whether applicant was in the house with the complainant.

Q. Do you remember an incident where you arrived home from work one day and the garage door opener had

been misplaced or broken? Do you remember that?

A. Uh-huh.

Q. Do you remember testifying to that?

A. Yes, I do.

Q. And your testimony then, you said that you honked for someone to open the garage and no one responded. You ran around the front door of the house and you found the door locked. Do you remember that?

A. Yes, I do.

Q. And you said that you thought that was unusual because you knew people were at home. Why did you think that was unusual?

A. Well, at that time you have to understand that I had just been told that my daughter had been molested. And the first thing that comes to your mind is fear and anger and you're grasping at straws trying to think, well, okay, this happened, is that a possible—something that could have happened, is that where it came from, was that an instance.

Q. And you said then that you banged on the door and [the complainant] was inside the house and she opened the door for you?

A. Uh-huh.

Q. And nobody else was in the house, none of the other kids were in the house with her?

A. I do not believe so.

Q. Do you remember if [applicant] was in the house with her?

A. I don't recall.

The brother (who also did not testify at the habeas hearing) testified at applicant's 1994 trial about another incident. The brother testified that, while he and the complainant were watching television in the living room, applicant took the complainant to the bedroom and left the broth-er in the living room watching television. The brother testified that the complainant and applicant were in the bedroom a long time during which the brother heard the bed squeaking. The brother testified that when "they came back out" he and the complainant "just watched TV." None of this evidence was recanted or called into question at the habeas hearing either.

An independent examination of applicant's 1994 trial record shows that applicant's new evidence has not unquestionably established his innocence. And, by not requiring an independent examination of the evidence from applicant's 1994 trial, the Court shows no respect for applicant's error-free conviction contrary to this Court's highly controversial 5–4 decision in *Elizondo. See Elizondo,* 947 S.W.2d at 209 (error-free conviction is entitled to the "greatest respect").

I respectfully dissent.