IN THE COURT OF CRIMINAL APPEALS


OF TEXAS


 




NO. AP-74,955






EX PARTE JOHN MICHAEL HARVEY, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM TARRANT COUNTY






 

 Hervey, J., filed a dissenting opinion in which Keasler, J., joined.



DISSENTING OPINION 



 I respectfully dissent. Twelve years ago, the State proved beyond a reasonable doubt that
applicant was guilty of the offense of aggravated sexual assault of a young child. This complainant
was three years old in 1989 when she first accused applicant of sexually abusing her, she was seven
years old when she testified at applicant's 1992 trial and she was eighteen years old when she
testified at the 2004 writ hearing.

 Evidence was presented at applicant's 1992 trial that the complainant lived with her mother
and applicant between October 1987 and February 1989, at which time the three-year-old 
complainant went to live with her maternal grandmother. Not long after this, the grandmother
noticed that the complainant was engaging in inappropriate sexual behavior and that the complainant
complained of pain in her "tush," which was the term she used to refer to her "private." Soon after
this, a child sexual abuse investigator (Wendt) interviewed the complainant who repeated her
accusations against applicant. Wendt also observed the complainant engaging in inappropriate
sexual behavior.

 After charges were filed against the applicant, the complainant's mother signed an affidavit
stating that the grandmother was responsible for the charges against the applicant because the
grandmother was vindictive and did not like the applicant. This affidavit also stated that, if anything
happened to the complainant, it had to have happened at the grandmother's because there "are a lot
of grown men that live next to [the grandmother], who see [the complainant], and go to the pool with
her." At applicant's 1992 trial, the complainant's mother testified on cross-examination by the
prosecution that the applicant prepared this affidavit and that she signed it during a period of time
when she was afraid of applicant because he was abusive to her.

 Q. [THE PROSECUTION]: Let's talk about the statement the defense counsel has
asked you about, where you said your mother was vindictive. Is that correct?


 A. [THE MOTHER]: Yes.


 Q. And you made that statement while you were still living with [applicant]; isn't
that correct.


 A. That's correct.


 Q. And that's after he had been charged with aggravated sexual assault of [the
complainant]; is that correct?


 A. That's correct.


 Q. At the time you gave this statement, who requested you write it out like that?


 A. [Applicant].


 Q. And, in fact, who initially wrote that statement out before you penned it in your
own handwriting?


 A. He did.


 Q. He wrote it out first, and you copied it; isn't that correct?


 A. Yeah. I had to put it in shorter verse.


 Q. Is that because someone told him he needed it in your handwriting?


 A. I don't recall. I know he told his attorney about it. And his attorney told him that
he couldn't use it.


 Q. Because it was in [applicant's] handwriting, this defendant's handwriting; is that
correct?


 A. I don't remember.


 Q. But at any rate, you had to rewrite it in your handwriting; is that right?


 A. Yes.


 Q. During this period of time, do you remember were you afraid of this defendant?


 A. Yes.


 Q. In fact, are you afraid of him now?


 A. Yes, ma'am.


 Q. Tell this jury why you were afraid of this defendant during this period of time?


 [DEFENSE COUNSEL]: Excuse me. Again, Your Honor, may we have our
objection?


 [THE COURT]: You can have a running objection to this.


 [DEFENSE COUNSEL]: Thank you.


 [THE COURT]: I'll overrule it.


 Q. At the time you gave this statement, why were you afraid of this defendant?


 A. He was abusive.


 Q. And how abusive are we talking about? Would he hit you?


 A. Yes.


 Q. In fact, he hit you quite often; didn't he?


 A. Too many times.


 Q. Ok. Your face-Was your face ever black and blue from the way he hit you?


 A. Yes, ma'am.


 Q. All this was still going on at the time you gave this statement; is that correct?


 A. Yes.


 At applicant's 1992 trial, the complainant's mother testified for the defense in support of
applicant's vindictive grandmother defensive theory which suggested that the grandmother (who
admitted at trial that she did not like the applicant) was somehow responsible for the three-year-old
complainant making the accusations against applicant and engaging in inappropriate sexual behavior. 
The complainant consistently repeated these accusations to investigators at various times without
the grandmother being present. The complainant's mother also testified that she did not remember
whether the complainant ever told her that applicant was sexually abusing her.

 Q. [THE DEFENSE]: Approximately how long did [the complainant] live with you
and [applicant]?


 A. [THE MOTHER]: From October of '87 until I sent her to [the grandmother's] in
March '89.


 Q. During that period of time, did [the complainant] ever tell you that [applicant] had
abused her sexually?


 A. I don't remember.


 Q. Well, is that something you would forget?


 A. I don't know. I was into a lot of drugs.


 During closing jury arguments at applicant's 1992 trial, the prosecution claimed that the
vindictive grandmother defensive theory was "absolutely preposterous."

 Grandmother is the next person you heard from. And she came here. And all she
was was setting the foundation of how she got the child and took the child-The
outcry was [Wendt]-and how she realized that something was wrong within a very
short period of time of getting this child, and then she took the child to the doctor and
how everything came about-identification of the parties and another very important
part, the sexual acting out of the child, and this is something, once again, I want you
to consider very carefully.


 Think about when the defense counsel asked the grandmother, "You've always
disliked John?" Did she hesitate for a moment about that? Who told us that?


 She did. She was very up-front. She doesn't like him and there's no question about
that.


 Now, let's go a step further. Does she strike you as the type person that would be so
evil-And you have to be evil to put a little girl through all this-to be so horrible that
she would get a little girl to go through everything that this little girl's gone through
in order to get back at this person? For what motive? Just because she didn't like
him?


 I think that is absolutely preposterous, given the evidence you have heard, and also
impossible given the very important evidence you have heard from [Wendt].


 And how in the world are you going to take a child and after having that child, in one
month have that child masturbating to the extent this child was?


 The acting out is phenomenal and it's the most important thing. Because everything
that grandmother told you, with no knowledge even to date of what [Wendt] was
going to come in here and tell you, was absolutely corroborated by what [Wendt] saw
in those five sessions, the outlandish masturbation, the continual reenacting with the
dolls.


 That cannot be faked. That cannot be coached. And that cannot be misled.

 

 The jury at applicant's 1992 trial apparently did not put any credence into the vindictive
grandmother defensive theory as shown by its verdict convicting applicant of the charges under
instructions that it could not do so unless it believed beyond a reasonable doubt that the applicant
was guilty. It is not clear whether applicant was still relying on the vindictive grandmother defensive
theory by the time of the 2004 writ hearing. The defensive theory at the 2004 writ hearing was that
the prosecutor at applicant's 1992 trial suppressed the complainant's statement that the person who
sexually abused her may have been a big man with a tattoo on his butt. The complainant's mother
testified at the 2004 writ hearing that this person could have been a family friend and that the
prosecutor would not permit her to raise this theory at applicant's 1992 trial.

 The evidence from the 2004 writ hearing, however, indicates that this family friend had no 
tattoo on his butt. The prosecutor from applicant's 1992 trial also testified at the 2004 writ hearing
that no one ever told her that the person who sexually abused the complainant may have had a tattoo
on his butt.

 Q. [APPLICANT]: If [the complainant] had told you that the person who did this had
a, quote, tatoo [sic] on his butt of an eagle, you'd have to provide that as possible
Brady material, wouldn't you?


 A. [PROSECUTOR]: If it was Brady material. If she had told me that, I would have
sent my investigator to the jail, take a picture of the [applicant's] rear so I could
determine whether or not he had one.


 Applicant was not described at the 2004 writ hearing as being big, and he has no tattoo on
his butt. And, no one ever took a picture of the applicant's butt while he was in jail awaiting trial
for this offense. (1) 

 Wendt also repeated her 1992 trial testimony at the 2004 live writ hearing. Applicant
attempted to keep this evidence from being presented live at the 2004 writ hearing because it was
"already part of the trial record."

 Q. [THE STATE]: In making a determination whether the charges are founded or
unfounded, are there procedures that you follow to determine the credibility of the
child?


 A. [WENDT]: Through a series of interviews, yes.


 Q. Can you tell us a little bit how you came to-were you able to arrive at a conclusion
that [the complainant] was credible during these interviews?


 A. I determined that her statement, affects, and behaviors were consistent.


 Q. Affect-


 A. Statements, affects, and behaviors were consistent.


 Q. What was that?


 A. Her statements that she made regarding sexual contact were extremely graphic
beyond a 3-year-old's level. Her affect during the course of my interviews with her,
she would become upset, frightened, cry when she was talking about what happened. 
Her behaviors were extremely sexual in my office, both with the use of dolls as well
as attempting to touch me, sexually touching herself during these interviews.


 Q. Okay. Are there any specific procedures which you utilized to determine whether
the child victim was coached during the interview process?


 A. Yes.


 Q. Did you make that assessment whether [the complainant] had been coached prior
to coming to see you?


 A. Yes.


 Q. And can you tell-what was your assessment on that coaching?


 A. That she was not coached prior to the interviews.


 Q. How did you make that assessment?


 A. By, you know, asking her what was said to her prior to the meeting.


 [APPLICANT]: Objection, personal knowledge.


 [THE COURT]: Okay. Your objection is what.


 [APPLICANT]: Well, it was personal knowledge. I understood her answer to be
what was said to her prior to the meeting, I assume it was by somebody else what was
said.


 [THE COURT]: Okay. You said that you'd made an assessment that she was not
coached before the meeting, correct?


 A. Before meeting with me, yes.


 [THE COURT]: And what was your question? How did she come to that
assessment?


 [THE STATE]: Yeah, how did she arrive to that assessment.


 [THE COURT]: Overruled.


 Q. How did you make that assessment?


 A. By talking to the child prior to meetings with me.


 [THE COURT]: Wait, wait, wait. By talking with the child before she met with you?


 A. I'm sorry, during meetings with me about what had been said to her prior to our
sessions. If her grandmother wanted her to say anything to her. I spoke with her
about what she understood was happening during our meetings, grandmother's
feelings towards both [applicant] and her mother. I noted her language that she used
to describe things, which was consistent with a 3-year-old child.


 Q. Tell the Court about the specifics of what happened, what you observed, and what was
said by [the complainant] during your interview in the playroom.


 [APPLICANT]: I'm going to object, Your Honor, that's already part of the trial
record. It's been well established in the trial record.


 [THE STATE]: You know, she came up here. I want you to determine credibility of
this witness, and I thought it would be better than having a cold record before you. 
This was the outcry witness that the State presented. 


 On at least one other occasion, applicant attempted to prevent the habeas judge from hearing
live other evidence that applicant claimed was presented at applicant's 1992 trial.

 Q. [THE STATE]: She sustained it.


 A. [THE COMPLAINANT'S MOTHER]: My mother had-


 [APPLICANT]: I'm sorry, ma'am.


 In this statement, did you not claim that if anything happened to your daughter [the
complainant], that it happened at your mother's house?


 A. If that's what I put in there, I probably said it and don't remember.


 [APPLICANT]: Objection. This whole issue has already been made part of the
record at the trial. It's been fully-


 [THE COURT]: At the jury trial?


 [APPLICANT]: Yes, Your Honor. I don't believe there's anything new about this
issue.


 [THE STATE]: Judge, our point is that [the complainant's mother] has made
different statements over the years about what she's told and what she's done and
who she's blamed for this offense.


 [THE COURT]: And who what?


 [THE STATE]: And who she has blamed-the people she has blamed other than
[applicant] for this offense, for this sexual molesting of her daughter.


 [APPLICANT]: May I respond?


 [THE COURT]: Yes.


 [APPLICANT]: All of that is already in the trial record. It's already been
documented that that's an issue. I don't think there's anything new about that.


 The complainant testified at the 2004 writ hearing that she did not tell the truth at applicant's
1992 trial even though she had no recollection of the specifics of her 1992 trial testimony.

 Q. [APPLICANT]: When-have you had a chance to look over the trial record of what
you said in that trial?


 A. [COMPLAINANT]: Yes.


 Q. When did you do that?


 A. I was 7 years old.


 Q. When did you actually review it, when did you look over it?


 A. Last night, actually.


 Q. And do you remember clearly what your testimony was at that trial?


 A. From reading it, yes, but from recollection, no.


 Q. Okay. So but you-do you recall being on the stand testifying?


 A. Yes.


 Q. And you say that you don't remember what your testimony is from your
recollection?


 A. Yeah. I remember bits and pieces from it, but the most thing I remembered from
the trial is that I wanted to get away and-


 Q. Let me get to that in just a minute, [complainant].


 At the time of the trial, when you testified, did you have any memory at that time-


 A. No, sir.


 Q. -of-let me finish the question. At that time you testified, did you have any
memory whatsoever of [applicant] sexually molesting you?


 A. No, I didn't.


 Q. Do you remember whether you were truthful in your testimony at trial?


 A. Honestly, I think, with reading my testimony, that my main, main state of mind
was that I wanted to get out.


 Q. Let me take you back to that day to the point that you can remember it. Do you
remember, looking back, whether you had told the truth that day or whether you had
not told the truth?


 A. I didn't tell the truth.

 

 On cross-examination, the complainant testified that she had no recollection of what
happened to her when she was "3 or 4 years old." This contradicted an affidavit that the complainant
filed about a year earlier in which she stated under oath that she had been sexually molested when
she was "3 or 4 years old." The complainant also testified that she has terrifying dreams of a big
man with a tattoo.

 Q. [THE STATE]: Now, I'm going to look at-I'm tendering State's Exhibit No. 1
and I'd ask you to look at it.


 A. (Witness Complies).


 Q. Have you looked it over?


 A. Yes.


 Q. You were under oath when you signed that, did you not?


 A. Yes.


 Q. And if you look at the second full paragraph in your affidavit, which is State's
Exhibit No. 1, which is attached as part of the pleadings in this case, you state,
"Around the time I was 3 or 4 years old, I was sexually molested by a man." Did you
state that?


 A. Yes.


 Q. Did you state that under oath?


 A. Yes.


 Q. Okay. So my-my question is: You would agree when you were 3 or 4 years old,
you were sexually molested?


 A. I have no recollection of it, and when I wrote that, it was from what I was going
by my memory and by what my mom and everybody else has gone on around me.


 Q. Okay. So when you wrote that, that wasn't necessarily the truth then?


 A. I guess.


 Q. And you were under oath when you wrote that?


 A. Yes.


 Q. Am I correct?


 A. Yes.


 Q. In any event, at the time you were 3 or 4 years old, you were living in Bedford,
Texas; is that correct?


 A I don't remember.


 Q. You don't remember where you were living?


 A. I don't remember back that far.


 Q. Okay. So you don't remember back that far. And I think you've testified today
that you have a recollection of a big man; is that correct?


 A. I have dreams of a big man, yes.


 Q. But you don't remember whether or not that big man is the one who sexually
molested you, do you?


 A. Yes, I do not have-there's no memory in my dreams of us doing any sexual
activity, nothing like that. I just know I see him and he's terrifying.


 Q. But you can't say what that-what that big man means?


 A. No, I can't.


 Q. And you can't say that he-if you were sexually molested, you can't say that it was
a big man-that big man, can you?


 A. I guess not.


 Q. You also state that, "I do remember that he was a very big man with a tatoo [sic]." 
You remember saying that in your affidavit?


 A. Yes.


 Q. What did this tatoo [sic] look like?


 A. It was an eagle.


 Q. Oh, it was an eagle. You remember the tatoo [sic]?


 A. Yes.


 Q. You personally-


 A. I remember seeing the tatoo [sic].


 Q. Okay. What did the tatoo [sic] look like?


 A. It was an eagle.


 Q. What was the-how was the eagle depicted?


 A. All I remember is that it was an eagle. I can't remember exactly how it was
placed.


 Q. Isn't it true that the tatoo [sic], the notion, the idea of a tatoo [sic], that was told
to you by your mother . . . ; isn't that true, she told you about the tatoo [sic]?


 A. Not necessarily, my whole family has told me about that tatoo [sic].


 Q. Your whole family has told you about the tatoo [sic]?


 A. Yes.


 Q. And isn't it true that you have no personal recollection of ever seeing tatoos [sic],
that your family told you about the tatoo [sic]?


 A. That's why I said I'm not sure if I'm basing it off recollection or by what I've been
told.


 Q. You remember-let's go back to the statement that you gave to Mr. De La Flor and
Ms. Windsor. Isn't it true, in that statement, that you told them that you had no
personal recollection of the tatoo [sic], that the only-you're basing the notion of a
tatoo [sic] on what other people told you? Isn't that true you said that?


 A. I can't remember back that far. I can't really remember what I've said.


 Q. Let me ask you this, [complainant]: If-you've already told the Judge right here
you have no recollection of what happened to you when you were 3 or 4 years old;
is that correct?


 A. Can you rephrase that.


 Q. You don't remember what happened to you when you were 3 or 4 years old; is
that true? You've already told the Judge that.


 A. Yes.

 

 The complainant later testified on recross-examination that her 2004 writ hearing testimony
was based on what she recollected on that particular day.

 Q. [THE STATE]: [Complainant], let me ask you this: You just testified that you
don't-at age 18, you don't have any recollection of what transpired, correct?


 A. [THE COMPLAINANT]: I don't know what you mean.


 Q. You don't remember anything about the sexual assault, you don't remember
anything?


 A. No.


 Q. Okay. So how do you remember what you didn't remember when you were 7?


 A. I remember that because it still haunts me to this day.


 Q. Okay. So you remember what you didn't remember when you were 7 years old? 
The question that [applicant's lawyer] asked you-


 [APPLICANT]: Objection, Your Honor, it's confusing the witness-may I expound
a little bit?


 [THE COURT]: Nay.


 [APPLICANT]: I didn't hear you.


 [THE COURT]: No.


 Go on to your next question.


 Q. Now, this happened when you were 3 and a half?


 A. I guess so.


 Q. Right. And you testified when you were 7?


 A. Yes.


 Q. Okay. And you remember what you-today you remember what you didn't
remember when you were 7.


 A. Yes, I remember that he did not do it.


 Q. Okay. So you do remember he didn't do it to you-


 A. That has always been my story.


 Q. But I'm kind of confused. You remember he didn't do something that didn't
happen is what you're saying today?


 A. Yes, I'm saying that I remember that he has never laid a hand on me. Never in my
life.


 Q. But I think you're also saying that today-at least today you're saying that you were
never sexually abused by anybody. Is that what you're saying?


 A. I'm-


 Q. So, I mean, it could have been a man that-


 [THE COURT]: Wait, let her answer that one.


 Today are you saying that you were never sexually abused by anybody?


 A. My recollection today, I don't believe so.

 

 The complainant explained that she made prior inconsistent statements in her affidavit based
on her recollection and what she was told by others.

 Q. [THE COURT]: How do you explain that your memory seems to be a little
different when you gave that statement in Conroe versus when you testify here?


 A. Can you rephrase it a little bit.


 Q. You remember the statement that the prosecutor was showing you that you had
given in Conroe?


 A. Yes.


 Q. Conroe, right, near Houston? You'd gone and talked to the-I think your lawyer
might have been outside or the DA's investigators and the two people sitting on that
row right there were there to talk to you. And you said some different things then
versus now. How do you explain that? That was only, what, a year ago?


 A. Yes. I was putting everything that I knew together when I made statements,
everything I knew about everything. Not just from my recollection but what I was
told, what I was-what I heard, everything. I had mixed it all up because I was so
confused, that I couldn't just go by my recollection because I honestly didn't know
what it was at the time.


 Q. Why do you think that now-when I ask you questions about the time of the
offense versus later memories, why do you think you're able to make that
differentiation now?


 A. Because I've talked to my dad about it a lot more.


 Q. Your dad, J.R.?


 A. Yes. I had talked to him and he gives me bits and pieces back, and he says, no,
that's not your recollection, that was it. And it's just been a lot of help with him.


 Q. Is he here?


 A. No.

 

 After both parties had questioned the complainant, the habeas judge (who was not the judge
who presided over applicant's 1992 trial) also questioned the complainant during which the
complainant testified that she has no independent recollection of what may have happened to her
when she was a child.

 Q. [THE COURT]: Okay. So do you have any independent remembrance of what
may have happened to you when you were a child?


 A. [THE COMPLAINANT]: No, ma'am.


 Q. And is that why now you say you think nothing happened?


 A. Yes.


 Q. So right now, under oath, do you think you were sexually assaulted or not?


 A. I don't believe so. All I know is that I feel terrified of big men, and I have no
reason to be but I am. And I don't know why. I've just always been that way.

 

 The habeas judge made two important findings in recommending that relief be granted on
applicant's 2004 "actual innocence" claim. The first of these findings states:

 On October 28, 1992, when [the complainant] was seven years old, she testified at
the applicant's trial about events that allegedly occurred four years earlier when she
was three. [The complainant]'s initial trial testimony was that she was not molested
and that applicant had not molested her. [The complainant] then testified at trial in
contradiction to her initial testimony inculpating the applicant.

 

 It is necessary to examine the 1992 trial record to determine whether the record supports this
finding. (2) And, an examination of the 1992 trial record indicates that the record does not support this
finding. The complainant testified at applicant's 1992 trial that the applicant touched her in her
"private" when asked specifically whether the applicant did anything to her that she did not like.

 Q. [PROSECUTION]: [Complainant], do you know the difference between telling
the truth and telling a lie?


 A. [THE COMPLAINANT]: Yes.


 Q. Is it good or bad to tell the truth?


 A. Good.


 Q. Is it good or bad to tell a lie?


 A. Bad.


 Q. If I said that the Judge up there was wearing a big purple hat, would that be a truth
or a lie?


 A. A lie.


 Q. If I said I was wearing a white dress, or a large white dress, would that be a truth
or a lie?


 A. The truth.


 Q. OK. You know how important it is that you tell the truth in the courtroom today?


 A. Yes.


 Q. OK. You know the oath the Judge gave you to tell the truth?


 A. Yes.


 Q. What happens if you don't tell the truth?


 A. You go to jail.


 Q. OK. And you promise only to tell us the truth here in court?


 A. Uh-huh.


 Q. Do you know why you're here, [complainant]?


 A. Yes.


 Q. Let me ask you, then, has anybody ever done something to you, touched you in a
way you didn't like?


 A. No.


 Q. OK. Has anybody ever touched you in a private place?


 A. No.


 Q. Do you remember anything bad happening to you while you were here?


 A. No.


 Q. Why are you here?


 A. To tell the truth.


 Q. OK. Tell the truth about what?


 A. (No response).


 Q. Do you know?


 A. (Witness shook head.)


 Q. You don't know?


 A. (Witness shook head.)


 Q. OK. Has anybody ever touched you in a private place?


 A. No.


 Q. Has anybody ever put anything in one of your private places, somebody else put
something in your private place?


 A. No.


 Q. OK. Are you scared in here of anything, [complainant]?


 A. No.


 Q. Do you remember talking to me earlier?


 A. Uh-huh.


 Q. Do you remember ever telling me that somebody touched you in a place you
didn't like?


 A. No.


 Q. You need to listen to my question. OK?


 Do you know somebody named John Harvey? Let me ask you that.


 A. Yes.


 Q. Do you see John Harvey in the courtroom?


 A. Huh-uh.


 Q. You don't?


 You remember telling me just a few minutes ago, saying that you did?


 A. No.


 Q. A person named John Harvey, how do you know him?


 A. I lived with him.


 Q. You did?


 Now, who all lived with you when you lived with him?


 A. My mom.


 Q. OK. Did John Harvey ever do anything to you that you didn't like?


 A. Yes.


 Q. Can you tell us what he did to you that you didn't like?


 A. He touched me in my private.


 Q. Would it be easier for you to talk about this, [complainant], if we used the doll
and you can show us what you mean?


 A. Yes.


 Using the dolls for demonstrative purposes, the complainant went on to describe in detail at
applicant's 1992 trial how the applicant sexually abused her. On cross-examination, the complainant
did not testify that the applicant did not sexually abuse her.

 During jury arguments at applicant's 1992 trial, the prosecution also addressed the
complainant's "initial statements that no one has ever touched me anywhere."

 I say that obviously because of [the complainant's] initial statements that no one has
ever touched me anywhere. But she came around with a little help. So please don't
have unrealistic expectations that she should simply walk in here like a trooper and
rattle off. Once again, those horrors which have occurred in her past. She can't do
it without help. And we're asking for your help for the rest of the way of this case.


 The most critical finding that the habeas judge made, in recommending that relief be granted
on applicant's 2004 "actual innocence" claim, states:

 The Court finds [the complainant] to be a credible witness in her testimony at the
subsequent writ hearing. Whether [the complainant] was sexually assaulted by a big
man with a tatoo or was not sexually assaulted at all, the common factor in her
statements is that the applicant did not sexually assault her. The court finds as a
matter of fact, that applicant did not sexually assault [the complainant] and is
factually innocent.

 

 The record does not support this finding either. The common factor in the complainant's
2004 writ testimony and the only finding that a fair reading of the 2004 writ record supports is that
the eighteen-year-old complainant has no independent recollection of what happened to her 15 years
ago when she was three years old. This does not constitute a recantation of her trial testimony and
it clearly should be insufficient to sustain applicant's burden to unquestionably establish his
innocence of the offense for which he was convicted beyond a reasonable doubt twelve years ago
at his error-free trial that our "actual innocence" jurisprudence has stated is entitled to the "greatest
respect." See Elizondo, 947 S.W.2d at 209; see also Herrera v. Collins, 506 U.S. 390, 403 (1993)
(reliability of criminal adjudications diminishes over time); McCleskey v. Zant, 499 U.S. 467, 491
(1991) (erosion of memory that occurs with the passage of time diminishes the chances of a reliable
criminal adjudication). No rational jury would acquit applicant because the complainant no longer
has any independent recollection of what happened to her 15 years ago when she was three and
because applicant's defensive theory keeps changing over time. See Elizondo, 947 S.W.2d at 209.

 I respectfully dissent.


 Hervey, J.

Filed: December 8, 2004

Do Not Publish


1. By the time of the 2004 writ hearing, therefore, the defensive theory had evolved from the
vindictive grandmother claim into claims that a big man with a tattoo on his butt may have sexually
abused the complainant or that a family friend may have sexually abused the complainant.
2. See Ex parte Harmon, 116 S.W.3d 778, 779 (Tex.Cr.App. 2002) (Hervey, J., dissenting); Ex
parte Tuley, 109 S.W.3d 388, 397 (Tex.Cr.App. 2002) (Hervey, J., dissenting).