IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,377






EX PARTE CURTIS EUGENE BROWN, Applicant








ON APPLICANT'S WRIT OF HABEAS CORPUS


FROM THE 24
TH JUDICIAL DISTRICT COURT


REFUGIO COUNTY





 Cochran, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Price, Womack, Johnson, Hervey and Holcomb, JJ., joined. Keasler,
J., concurred in the judgment.


O P I N I O N 



 Applicant pled guilty to aggravated sexual assault of a child, and the trial court placed
him on community supervision. The trial court later adjudicated his guilt and sentenced him
to prison. Applicant then filed a motion for new trial claiming that newly discovered
evidence proved that he was actually innocent of the original offense because the child, at
that time, said that she had lied about the sexual assault. The trial judge interviewed the child
in camera, but he denied the motion for new trial because he did not believe her recantation. 
 Applicant filed this writ application two years later and made the same claim-that the child's
recantation was newly discovered evidence that proves his innocence. The habeas judge
entered findings of fact and recommended that we grant relief. We hold that this evidence
is not newly discovered, and, in any event, applicant failed to prove his innocence. We
therefore deny relief.

I.

 On July 26, 1998, when C.B. was seven or eight years old, she told her mother,
Valerie, that applicant, C.B.'s great-uncle, had sexually molested her. C.B. used hand
motions to show Valerie what applicant did to her. Jacqueline, Valerie's sister, was present
when C.B. described the sexual abuse to her mother. Valerie, who stated that "I believe
anything my daughter said," was angry when C.B. told her about the incident. In fact, she
testified that she "snapped. I went off. I started cussing. I went looking for him" and did not
even "finish listening to the whole story." When both Valerie and Jacqueline confronted
him, applicant said "he hadn't done that." 

 Someone anonymously called Child Protective Services, which investigated the
allegation. Valerie said that she did not call the police because "families stick together." She
later testified before the grand jury that she believed C.B.'s accusations because, in her mind,
no child is going to make up something like that. At the time C.B. told her of the sexual
abuse, as well as at the time of her grand jury testimony, Valerie believed her daughter and
knew of no reason why C.B. would make up a story. Valerie also told the grand jury that
applicant had molested her when she was a child. 

 On March 21, 2000, applicant pled guilty to aggravated sexual assault of a child and
was placed on ten years' community supervision. The State filed a motion to adjudicate guilt
in November of 2001, alleging a new DWI offense as well as several technical violations. 
The trial court adjudicated guilt and sentenced applicant to twelve years' imprisonment on
February 27, 2002. Applicant timely filed a motion for new trial based on "newly discovered
evidence" that he was not guilty of sexually molesting C.B. He attached a recantation
affidavit signed by C.B. (1) and four other affidavits signed by (1) himself, (2) Valerie, (2) (3)
Jacqueline, (3) (4) and C.B.'s great-grandmother. C.B.'s and Valerie's affidavits said that C.B.
had lied when she stated that applicant had sexually molested her. At the hearing on the
motion for new trial, the parties agreed that the trial judge could interview C.B. in chambers
about her recantation. After that interview, the trial judge stated, "I do not believe the
recantation of the child," and he denied the motion for new trial. 

 After two more years, applicant filed an application for a writ of habeas corpus,
making the same claim of actual innocence and attaching the same affidavits. We remanded
the case to the trial court to conduct a live evidentiary hearing. (4) At the habeas hearing,
Valerie testified that C.B. had lied about the sexual assault. She said that C.B. was mad at
applicant "because he made her get off the couch and put her on the floor." "She didn't want
to get on the floor. She wanted to sleep on the couch." Valerie testified that, about two years
after this couch incident, C.B. came to her, crying and saying that "she got Uncle Curt in
trouble." This recantation happened shortly before the hearing on the motion for new trial. 
 During the habeas hearing, the State questioned Valerie about two statements she now
claimed were lies. The first was her grand jury testimony that applicant had molested Valerie
when she was young. Valerie testified that she said this because "I wanted to do anything
possible if he had touched my daughter to get him in trouble. I'd say anything." Valerie also
told the grand jury that applicant had admitted to his mother (Valerie's grandmother) that
he had "a problem with molesting children." Valerie explained that she just made up some
of her grand jury testimony:Q: When you testified to the grand jury-and let's be clear about that-that
was, I don't have a date. When you testified to the Refugio County
Grand Jury, at that time you did not really want your uncle, Curtis
Brown, to be indicted for this offense of sexually assaulting your
daughter?


A: That's correct.


Q: You wanted it handled within the family?


A: That's correct.


Q: And, yet, you still told this lie about how he had molested you when
you were a child?


A: Yes.


Q: Why? Why did you tell the grand jury a lie like that?


A: Because my daughter-I wanted-if he hurt my daughter, I wanted him
to hurt, too.


Q: But you didn't want to get him indicted?


A: I wanted-if it happened, I want him to get help.


Q: But you wanted to hurt him?


A: Yeah, and so - in so many words, yeah.


Q: But you didn't want to get him indicted?


A: I didn't want him to go to prison.


Q: So you wanted to hurt him, but you wanted him to get help. You didn't
want him to go to prison and you were willing to lie in order to get all
of that, is that correct?


A: Yes.

 

Q: Now, Curtis Brown has admitted to your grandmother, his mother, that
he has a problem about molesting children, hasn't he?


A: If he did, I don't know. You would have to ask my grandmother that.


Q: Well, that's what you told the grand jury?


A: That's what who?


Q: That's what you testified to the grand jury.


A: Like I told you [a]while ago, I said a whole lot of things to the grand
jury that was untrue.


Q: Well, was that something you made up out of thin air or had you heard
that?


A: It might have been something I've made up, but my grandmother
haven't told me anything like that.

Valerie also testified at the habeas hearing that she did not remember when C.B. actually told
her that she had lied about applicant sexually assaulting her. (5) 

 C.B., who was in the ninth grade at the time of the habeas hearing, was equivocal
about whether she had testified to the grand jury. She did remember telling her mother that
applicant had molested her. She did not know why she would make up a "vicious story"
about her uncle. The State asked C.B. about the conversation she had with the trial judge in
his chambers almost four years earlier:

Q: Do you remember going into his office and talking to him alone?

A: Oh, yes, sir.

Q: Do you remember what you told him?

A: I told him that he didn't do it and I was lying.

Q: Did you admit that, in fact, you had told the truth?

A: Sir?

 Q: Did you also tell him you had originally told the truth? Well, let's back
up. Why did you lie, if you lied when you first told your mother? Why
did you lie to her?


A: Because he made me mad.

Q: How did he make you mad?

A: Because I was asleep and he made me get off the couch.

Q: That made you mad so you knew he would get in big trouble if you told
your mother that he had molested you?


A: Yes, sir.

Q: And you wanted him to get in really big trouble for doing this, is that
right? Is that right?


A: Yes, sir.

Q: And, [C.B.], one of your aunts says that you've always been a truthful
child, is that true?


A: Yes, sir.

Q: So why would you make up a vicious story like that about your uncle
merely for making you get off the couch?


A: I don't know.

C.B. then stated that it was hard for her to remember everything about the alleged offense
because it was seven years after that event. "I can't remember. It's been a long time." The
State then questioned her about one possible motive for the recantation-pressure from her
family. C.B. responded that she did not know if her family talked very much about applicant
being in prison. She said that her great-grandmother, applicant's mother, had never told her
that applicant was in prison or that he was in prison because of her. 

 Applicant testified that on the night of the incident he went to the Cowboy Lounge and
"had a few beers." He decided to stay at his mother's house to avoid getting on the highway. 
When he got to his mother's house, applicant noticed that C.B. was sleeping on the love seat,
approximately four or five other children were sleeping on pallets on the floor, and two
adults were on the couch. Applicant testified that there were about fifteen people in his
mother's house that night. Applicant said that he picked C.B. up and put her on the floor. 
Then he went into his father's room, got a blanket, and slept on the love seat. He didn't
know if she ever woke up. Applicant said that he pled guilty to sexually assaulting C.B.
because "I have a nephew that's been sent to prison with a similar case, and my dad told me
that if I didn't have a decent lawyer, it was probably going to happen to me too." 

 David Guy, a deputy sheriff with specialized training in interviewing child sex-abuse
victims, testified that he interviewed C.B. on August 8, 1998. After establishing rapport, 
Deputy Guy asked C.B. to describe the incident with applicant. Nothing she said raised a
"red flag" in the sense that her statements were not accurate. He testified, 

 Third graders are generally either seven or eight and the child simply doesn't
have the emotional and mental sophistication to be a successful actor. They,
if they present a play or something to that sort, it's rather mechanical and rote
memorization of very short lines. They just don't have the capability of
memorizing a sophisticated story and recanting [sic: recounting?] it.


C.B. told the deputy that she was very concerned about the effect that this incident would
have on her family. Deputy Guy testified that it is "not at all" unusual for children who have
suffered sexual abuse to later recant their testimony.

 The habeas judge entered findings of fact summarizing the pertinent dates, events, and
testimony. He did not make any finding concerning credibility of any of the witnesses, but
he did conclude that "the new evidence unquestionably establishes Applicant's actual
innocence of the aggravated sexual assault of C.B." He recommended that this Court grant
relief.II.

 In 1996, this Court recognized that "the incarceration of an innocent person is as much
a violation of the Due Process Clause as is the execution of such a person." (6) Additionally,
we have held that claims of actual innocence based upon newly discovered evidence are
cognizable on post-conviction writs of habeas corpus. (7) This is true regardless of whether the
applicant pled guilty or had a jury trial; an applicant can bring an actual-innocence claim
based on newly discovered evidence in either situation. (8) 

 This Court now recognizes two types of "innocence" claims. The first-a Herrera
claim-is a substantive claim in which the person asserts a "bare claim of innocence" based
solely on newly discovered evidence. (9) The other type of innocence claim-a Schlup claim-
is one that "does not by itself provide a basis for relief," but is intertwined with constitutional
error that renders a person's conviction constitutionally invalid. (10) 

 Establishing a bare claim of actual innocence is a Herculean task. We have stated that
"any person who has once been finally convicted in a fair trial should not be permitted to
wage, and we do not permit him to wage, a collateral attack on that conviction without
making an exceedingly persuasive case that he is actually innocent." (11) Thus, to succeed in
an actual innocence claim the applicant must show "by clear and convincing evidence that,
despite the evidence of guilt that supports the conviction, no reasonable juror could have
found the applicant guilty in light of the new evidence." (12) This showing must overcome the
presumption that the conviction is valid and it must unquestionably establish applicant's
innocence. (13) 

 Not only must the habeas applicant make a truly persuasive showing of innocence, he
must also prove that the evidence he relies upon is "newly discovered" or "newly available." 
The term "newly discovered evidence" refers to evidence that was not known to the applicant
at the time of trial and could not be known to him even with the exercise of due diligence.
He cannot rely upon evidence or facts that were available at the time of his trial, plea, or
post-trial motions, such as a motion for new trial. (14) The trial is "the main event," (15) it is not
a try-out on the road to a post-conviction writ of habeas corpus. (16) A claim of actual
innocence is not an open window through which an applicant may climb in and out of the
courthouse to relitigate the same claim before different judges at different times. Thus,
habeas relief is not available to one who has already litigated his claim at trial, in post-trial
motions, or on direct appeal. Claims that have already been raised and rejected are not
cognizable, (17) but an exception to this rule is when "direct appeal cannot be expected to
provide an adequate record to evaluate the claim in question, and the claim might be
substantiated through additional evidence gathering in a habeas corpus proceeding." (18) 
Therefore, this Court will often provide an opportunity for a writ applicant to proffer
additional evidence to establish his claim of actual innocence, even when a small portion of
that evidence was available at an earlier time. (19)

 In Ex parte Franklin, (20) this Court held that, before a habeas applicant is entitled to a
hearing, the applicant must make a claim that, if true, establishes affirmative evidence of his
innocence. (21) Then, at the hearing, the trial judge assesses the witnesses' credibility, examines
the "newly discovered evidence," and determines whether that "new" evidence, when
balanced against the "old" inculpatory evidence, unquestionably establishes the applicant's
innocence. (22) The habeas judge then sets out findings of fact and conclusions of law, and he
makes a recommendation to this Court. Upon submission to this Court, we review the factual
findings with deference because the habeas judge is in the best position to make credibility
judgments. (23) Even though deference is the prescribed standard, we are not bound by the
habeas judge's findings, conclusions, or recommendations when they are not supported by
the record. (24)

 III.

 In this case, applicant argues that the habeas court's findings of fact and conclusions
of law support the conclusion that he is actually innocent of sexually assaulting C.B. because
of newly discovered evidence of C.B.'s recantation. The State asserts that the evidence
presented at the habeas hearing was neither newly discovered nor credible. The State argues
that 

 [p]erhaps the most compelling argument in this case is that the recantation at
the writ of habeas corpus hearing was not "newly discovered evidence," which
is required in Tuley. . . . The very affidavit used in the application for writ [of
habeas corpus] was used in the motion for new trial. . . . The actual trial judge
who heard the guilty plea (Judge Kilgore) and considered its evidence, which
included the plea memorandum, the judicial confession, the sheriff's
department's report which contained a statement of the victim, and the
Children's Protective Services Report, interviewed the complainant in
chambers and found her recantation to be unbelievable. (25)


 We agree that the evidence applicant presented at the habeas hearing was not newly
discovered. He simply attached the same affidavits to his writ application that he had
attached to his motion for new trial two years earlier. Nonetheless, we remanded the case
for a live evidentiary hearing to give applicant an opportunity to present whatever "new"
evidence he had to support this "old" allegation, as we sometimes permit in claims of
ineffective assistance of counsel. (26) The first issue now before us is what "newly discovered evidence" did the applicant
present at the habeas evidentiary hearing. The habeas judge mentions the former hearing on
the same exact issue, but applicant provides no rationale for why this claim or the evidence
supporting it is different in quality from the evidence presented at the hearing on the motion
for new trial. We are unable to find any substantively new and compelling evidence in the
habeas record that the trial judge did not consider at the time he denied applicant's motion
for new trial. Indeed, the habeas record does not contain the CPS records or the police
offense report that the original trial judge had before him at the time of applicant's plea and 
of the motion for new trial hearing. Nor does the habeas judge make any reference to these
materials, which are surely relevant to the issue of applicant's guilt or innocence. This
habeas record does not contain any significant "new" exculpatory evidence, and it fails to
include significant "old" inculpatory evidence.

 The second issue before us is the inherent persuasiveness of the evidence establishing
innocence. The habeas judge briefly mentions the live testimony from the habeas hearing,
but says nothing about the credibility of the witnesses. The habeas judge states, "C.B.
testified that her [great-] uncle never molested her, [and] that she had lied about it [.]" He
concludes that "[t]he evidence of Applicant's guilt is far outweighed by the evidence of his
innocence." But there is no explanation of whether or why this evidence is more believable
than the evidence supporting applicant's guilt. And the habeas judge points to nothing in
the record that "unquestionably" demonstrates applicant's innocence.

 The "actual innocence" conclusion does not logically flow from the record evidence. 
First, one might assume that the habeas judge must have believed C.B. more than the trial
judge who first heard and rejected her recantation some three years earlier, even though he
did not say so in his findings. But there is no explanation either in the evidence or the
findings about any objective basis for this unstated assumption. C.B.'s testimony at the
habeas hearing is vague, uncertain, and nonspecific. She simply claims a lack of memory as
she makes a global denial of sexual abuse. Some seven years after the event, she testified
that she made up her allegation merely because she was mad at applicant for moving her in
the middle of the night from a love seat to the floor to be with her sleeping cousins. This
explanation is dubious at best. 

 Second, although C.B.'s mother testified to her daughter's general truthfulness, and
she said that she believed C.B. at the time of the outcry because her daughter is a truthful
person, she now says that her daughter was a liar on this one crucial topic. Her testimony
creates a logical contradiction: C.B. is both a truthful person and a liar who accused her
great-uncle of sexual abuse merely because she was angry with him for moving her from a
sofa to the floor one night. A reasonable conclusion would be that she is willing to lie about
almost anything simply because she is momentarily angry.

 Third, the conclusion that C.B. was an accomplished liar at the age of seven is
contradicted by Deputy Guy, who found her account of the sexual abuse credible and
concluded that nothing she said raised a "red flag" to him. He has specialized training in
interviewing child sex-abuse victims, but the habeas judge never mentioned Deputy Guy's
testimony or explained why his expert testimony was not credible and should be rejected. 

 Fourth, Valerie testified before the grand jury that applicant had sexually abused her
when she was a child, but, at the habeas hearing, she explained that she just made up lies
because she was mad at applicant. (27) If one accepts the fact that Valerie makes up lies so
easily, then why would anyone credit her testimony at the habeas hearing any more than her
testimony to the grand jury? It would seem a logical conclusion from this record that she is
simply not a credible person and that all of her testimony is equally suspect. 

 Applicant's testimony, on the other hand, is startlingly specific, given his position that
nothing unusual happened that evening and that C.B. was never even fully awake when he
moved her from love seat to the floor. Applicant's explanation for pleading guilty, even
though he was not guilty, was because he had a nephew who had gone to prison for a similar
offense, and his father told him that if he didn't have a decent lawyer, he-applicant-would
probably go to prison also. This explanation, though not entirely implausible, is hardly
persuasive. 

 Finally, the timing of C.B.'s recantation is, at least on its face, highly suspicious. It
was only after applicant's guilt was adjudicated and he was sentenced to twelve years in
prison-more than three years after the alleged offense-that C.B. suddenly told her mother
that she had been lying all along. She, her mother, her aunt, and applicant's mother (28) all
signed affidavits just in time to file a motion for new trial. Although it is entirely possible
that a child suffering from a guilty conscience for causing an innocent relative to go to prison
because of her lies might suddenly admit to those lies, there is nothing in the record to
indicate that C.B. knew that applicant might go to prison because of her earlier allegations. 
 There could, of course, be some logical explanation for the coincidental timing of C.B.'s
sudden recantation, but it is not in the record. 

 In sum, there is nothing in the record that demonstrates (1) why the habeas judge did
believe, or should have believed, that applicant's witnesses at the habeas hearing were
credible and (2) how this testimony differs from the previous testimony at the motion for new
trial such that it constitutes "newly discovered evidence" that was not available and could not
have been discovered for that hearing. Although courts must carefully examine a credible
claim of actual innocence-even one made many years after the alleged crime- recantations
in "She said, He said" sexual assault cases are not rare. (29) Such post-conviction claims should
not be accepted without close scrutiny nor, generally, without strong corroboration by
independent evidence. In the present case, the habeas record does not show that applicant's
evidence is either newly discovered or that it unquestionably establishes his innocence.

 We therefore deny relief.


Delivered: November 1, 2006

Publish
1. C.B.'s affidavit stated that she "did not tell the truth about Uncle Curtis the first time. 
When they asked me what happened I told them that I was scared that he was going to do
something to me. He didn't do nothing to me, but I was mad at him, because he made me get
up."
2. In her affidavit, Valerie stated that after she had confronted applicant, she "told [her]
Grandmother what had happened. We talked it over and I agreed to leave it as something in the
family. I decided not to report it to the authorities. In my mind I still believed that Curtis had
molested my daughter. . . . Several weeks later I was taken to the Refugio County Grand Jury and
asked to give testimony. During that testimony I told several lies. I was still angry with Curtis
and I wanted him to pay for what he did to [C.B.]. I remember telling the Grand Jury that he had
molested me when I was a child and that was not true. I'm not very sure of all that I told the
Grand Jury that was a lie but there were several things that were just out right lies."
3. Jacqueline's affidavit stated that she thought that she was called to the grand jury to
testify about applicant's drug use. She also stated that "I know that Uncle Curtis was a 'Player.' 
That is he had a lot of women. I don't believe that he would ever have to molest anyone."
4. The judge who heard the motion for new trial had retired, so a new judge presided over
the habeas hearing.
5. The prosecutor questioned Valerie about the timing of C.B.'s recantation:

Q: When did she tell you this?

A: Honestly, I can't answer that, but it was after grand jury, after we had the
grand jury hearing; sometime after that. I'm not sure how long after that,
but she came to me and told me.

Q: Are we talking weeks, months, years?

A: I'm not sure.

Q: You have no idea whether it was years or days after the grand jury?

A I'm not sure. This has been a long time that this has happened. I'm not
going - it's not going to - 

 . . . .

Q: Well, you don't know when she told you this story that -

A: I know she told it to me, but when she told it to me, I don't, I don't
remember.
6. Ex parte Elizondo, 947 S.W.2d 202, 206 (Tex. Crim. App. 1996).
7. See State ex rel. Holmes v. Third Court of Appeals, 885 S.W.2d 389, 398 (Tex. Crim.
App. 1994, orig. proceeding) (stating that actual innocence claims for inmates sentenced to death
are cognizable in a habeas corpus application); see also Ex parte Elizondo, 947 S.W.2d at 205.
8. Ex parte Tuley, 109 S.W.3d 388, 393-96 (Tex. Crim. App. 2002). In Tuley this Court
stated, 

 Convictions based on knowing, intelligent, and voluntary pleas of guilty ought to be
afforded the highest level of respect.

 . . . .

 If we have reason to think that an applicant's plea was accurate and reliable, we
would conclude that the claim would not support relief for actual innocence. But when a
habeas record supports a finding that new evidence unquestionably established an
applicant's innocence, it is difficult to conclude that a prior guilty plea was accurate or
reliable.

Id. at 394.
9. Id. at 390.
10. See Schlup v. Delo, 513 U.S. 298, 315 (1995) (comparing a bare-innocence claim with
the claim that Schlup was making on habeas corpus and stating "[Schlup's] claim for relief
depends critically on the validity of his Strickland and Brady claims. Schlup's claim of
innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas
petitioner must pass to have his otherwise barred constitutional claim considered on the merits'")
(footnote omitted); Ex parte Tuley, 109 S.W.3d at 390.
11. Ex parte Elizondo, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996).
12. Ex parte Tuley, 109 S.W.3d at 392; see also State ex rel. Holmes, 885 S.W.2d at 399 
("'To be entitled to relief, however, petitioner would at the very least be required to show that
based on proffered newly discovered evidence and the entire record before the jury that convicted
him, 'no rational trier of fact could find proof of guilt beyond a reasonable doubt.'"') (quoting
Jackson v. Virginia, 443 U.S. 307, 324 (1979)).
13. Id.
14. See, e.g., Ex parte Briggs, 187 S.W.3d 458, 465 (Tex. Crim. App. 2005) (rejecting
applicant's "actual innocence" claim based, in part, on trial court's finding that the medical
evidence supporting applicant's claim had been available at the time of trial); Ex parte Tuley, 109
S.W.3d at 403 (noting that "[t]he fact that there was some evidence at the time of the applicant's
trial that could have been used to impeach the complainant, does not mean that her affidavit
recanting her trial testimony is not new evidence that affirmatively demonstrates the applicant's
innocence") (Price, J., concurring in denial of reh'g).
15. Anderson v. Bessemer City, 470 U.S. 564, 574-75 (1985); see also Wainwright v. Sykes,
433 U.S. 72, 90 (1977) (stating that the determination of guilt or innocence in a criminal trial is
"a decisive and portentous event" because "[s]ociety's resources have been concentrated at that
time and place in order to decide, within the limits of human fallibility, the question of guilt or
innocence of one of its citizens").
16. See Herrera v. Collins, 506 U.S. 390, 409-11 (1993) (discussing history of procedural
rules requiring a defendant to file a motion for new trial based on newly discovered evidence,
including evidence of actual innocence, within a definite time period).
17. See Ex parte Acosta, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984) (refusing to address
a claim which was previously raised and rejected on direct appeal).
18. Ex parte Torres, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).
19. See Ex parte Tuley, 109 S.W.3d at 403 (Price, J., concurring in denial of reh'g).
20. 72 S.W.3d 671 (Tex. Crim. App. 2002).
21. Id. at 678 ("[W]e hold that when an applicant asserts a Herrera-type claim based on
newly discovered evidence, the evidence presented must constitute affirmative evidence of the
applicant's innocence. Once the applicant provides such evidence, it is then appropriate to
proceed with a determination of whether the applicant can prove by clear and convincing
evidence that no reasonable juror would have convicted him in light of the newly discovered
evidence").
22. Id.
23. Ex parte Thompson, 153 S.W.3d at 417-18, 425.
24. Id. at 417-18.
25. State's Brief at 7.
26. See Ex parte Nailor, 149 S.W.3d 125, 130-31 (Tex. Crim. App. 2004) (stating that a
defendant claiming ineffective assistance of counsel may re-urge a claim in a habeas corpus
application that he had previously raised in a direct appeal if he provides additional evidence to
prove his claim).
27. Strangely, in the affidavit Valerie made for the motion for new trial hearing, she stated,
"I thought everything was dropped and never knew that [applicant] was on probation for this
case. I always thought he was on probation for drugs." 
28. Applicant's mother's affidavit stated that the alleged incident took place in her home,
but she is a light sleeper because of the medications she takes, and she or someone else in the
home would have seen and heard any untoward activities, had they occurred.
29. See Ex parte Elizondo, 947 S.W.2d 202, 209-10 (Tex. Crim. App. 2005); Ex parte
Franklin, 72 S.W.3d 671 (Tex. Crim. App. 2002); Ex parte Tuley, 109 S.W.3d 388, 392 (Tex.
Crim. App. 2002); Ex parte Harmon, 116 S.W.3d 778 (Tex. Crim. App. 2002).