**Ex Parte Stephen Craig THOMPSON, Applicant.**

No. AP–74820.

Court of Criminal Appeals of Texas, En banc.

Jan. 12, 2005.

Gary A. Udashen, Dallas, for Appellant.

Christina O'Neil, Asst. District Atty., Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

JOHNSON, J., delivered the opinion of the Court, joined by MEYERS, PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ.

This is a post-conviction application for a writ of *habeas corpus* filed pursuant to Tex.Code Crim. P. Article 11.07. In 1991, a jury convicted applicant of aggravated sexual assault of a child (Tex. Pen.Code § 22.021(a)(1)(B)) and assessed punishment at thirty years' imprisonment. The conviction was affirmed on appeal. *Thompson v. State,* No. 05–91–01200–CR, 1993 WL 407278 (Tex.App.-Dallas, October 14, 1993). In this application applicant contends that newly discovered evidence shows that he is actually innocent. Following an evidentiary hearing, the trial court entered findings of fact and conclusions of law indicating that applicant is entitled to relief.

In *Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim.App.1996), this Court held that bare claims of actual innocence are cognizable in a *habeas* proceeding, even in non-capital cases. *Ex parte Elizondo,* 947 S.W.2d at 205. To merit relief, the applicant bears the burden of showing that the newly discovered evidence unquestionably establishes his or her innocence. *Id.* at 209. The court reviewing the *habeas* claim must examine the new evidence in light of the evidence presented at trial:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial.

*Id.* at 206. In order to grant relief, the reviewing court must believe that no rational juror would have convicted the applicant in light of the newly discovered evidence. *Id.* at 207.

In this case, the *habeas* court received evidence and testimony at the writ hearing. The court weighed the new evidence and testimony against the evidence adduced at applicant's trial, determined that applicant had met the burden of showing his actual innocence, and recommended that this Court grant relief. This Court is not bound by the findings, conclusions or recommendations of a trial court. However, because the *habeas* court is in a better position to make determina-

tions of credibility [1] in this case, we should defer to those findings if they are supported by the record. *Ex parte Bates*, 640 S.W.2d 894, 898 (Tex.Crim.App.1982); *Ex parte Turner*, 545 S.W.2d 470, 473 (Tex. Crim.App.1977). In this case, the findings of the *habeas* court are supported by the record.

Applicant was convicted of sexually assaulting his five-year-old daughter, who was eight years old at the time of the trial. The evidence presented against applicant at trial consisted of the following: the testimony of the complainant, the testimony of the complainant's mother, the complainant's torn dress (which the state alleged was torn by applicant during the assault), the testimony of the arresting police officer, and the testimony of the physician who examined the complainant.

The physician testified that the results of the complainant's examination were completely normal. However, he also stated that the lack of physical evidence of sexual abuse was "consistent with digital penetration."

The defense presented only the testimony of applicant's two sisters, who were also the complainant's aunts.

Applicant did not testify during the guilt/innocence phase of trial, but he did take the stand during the punishment phase. During testimony about whether applicant would be able to adhere to conditions of probation, applicant responded to a question by his defense attorney regarding his feelings about the offense:

Q. Steve, I want you to look at this jury and tell them whether or not you're sorry that this happened.

A. Yes, I'm truly sorry about this happening and as long as I live I will never let it happen again.

That statement was followed by an exchange with the prosecutor on cross-examination:

Q. You just told this jury that you were truly sorry for what happened, what you did to [C.T.], didn't you?

A. Yes, that's correct.

Q. And yet you just sat up there and said you have no love in your heart for [C.T.], didn't want to establish any sort of relationship with her and yet you were the one who victimized [C.T.], weren't you?

A. If I did have anything to do with my daughter, they would come back and say—

Q. That's not what I asked you, Mr. Thompson. You were the one who victimized [C.T.], your five-year-old daughter at the time?

A. I want to plead the Fifth on that.

THE COURT: Answer the question.

THE WITNESS: Could she repeat it, please?

Q. You were the one who victimized your daughter when she was five years old and you just sat here and told the jury that you were truly sorry for what happened?

A. Yes.

Q. And yet you're holding her responsible or at fault and don't want to have any sort of relationship with her as a result of what happened, what you created, a problem you created?

A. I just don't want to have—I don't— I just don't—

Q. Is that because you don't trust yourself around her?

---

1. We defer to the trial court's findings of fact even when those findings are based on affida- vits rather than live testimony. *Manzi v. State,* 88 S.W.3d 240 (Tex.Crim.App.2002).

A.  No. I just, you know—I don't want to have anything to do with her, no, ma'am. I don't—

Q.  It's her fault that this happened, isn't it?

A.  No, no.

Q.  So now you're going to take responsibility for what happened? Are you going to take responsibility for what happened, Mr. Thompson?

A.  Yes, yes.

At the *habeas* hearing, various witnesses described the ongoing custody dispute between applicant and his ex-wife at the time the accusations were made against him. Applicant presented the affidavit and testimony of the complainant herself, now 20 years old. She testified that the sexual abuse never happened, but that her mother had pressured her into making the allegations against her father. According to the complainant, when she was five years old, her mother repeatedly asked her whether her father had done specific things to her. When she replied that her father had not done anything, her mother became angry and would not allow the complainant to play or go anywhere until they had talked about it. Eventually, the complainant succumbed to the pressure and "admitted" that applicant had done the things described by her mother. The complainant also testified that she was afraid of her mother, and applicant presented evidence of specific episodes of physical abuse of complainant by her mother over the years since applicant's trial.

The complainant's mother testified at the *habeas* hearing and admitted to several acts of physical abuse against the complainant, although she appeared to minimize their significance. She also admitted to having doubts about whether applicant had committed the acts for which he was convicted. However, she denied that she and applicant had been involved in · any kind of custody dispute at the time of the accusations. She also vehemently denied having pressured the complainant into making the allegations. As she had at applicant's trial, she testified that her suspicions were aroused when the complainant came home from a visit with her father with a torn dress. She also testified that her daughter had complained of irritation of her genitals, and painful urination. She stated that she noticed redness in the complainant's genital area when she bathed her. However, she also admitted that she had raised the subject of sexual abuse with C.T. before the torn-dress incident. At the *habeas* hearing, the complainant's mother admitted that the complainant had told her that the dress was torn on the bus after church, but that she did not believe the complainant's explanation. Applicant presented the testimony of the church bus driver, who testified that she had witnessed C.T. falling on the bus and tearing her dress and that applicant had nothing to do with the dress being torn.

Applicant testified at the *habeas* hearing and again denied that he had ever had any kind of sexual contact with his daughter. He testified that his retained attorney had advised him to tell the jury during the punishment phase that he was sorry for what he had done. According to applicant, his attorney had indicated that he would receive a more lenient sentence if he admitted his guilt at punishment, and he had simply followed his attorney's advice.[2] He

---

2.  The record reflects a question about whether applicant's trial attorney was licensed to practice law at the time of applicant's trial. The state bar reports that applicant's trial counsel was actively suspended from 11/01/1989 until 05/01/1991 (applicant's trial began on 08/12/1991). The State Bar also reports that, on 10/05/1992, counsel "resigned in lieu of disciplinary action." The court of appeals rejected applicant's argument that

admitted that his attorney had not instructed him to "plead the Fifth."

Finally, applicant presented the testimony of Lynne Corsi, an attorney and licensed Master Social Worker who had worked as an assistant district attorney prosecuting cases of child abuse and neglect and who had founded the Dallas Children's Advocacy Center. Ms. Corsi testified as an expert on interviewing techniques and recantations in child sexual-abuse cases. She offered her opinion that the complainant's recantation in this case was valid. She explained the bases for her opinion in detail at the hearing and indicated that her conclusion was reached after a thorough review of the transcript and record of applicant's trial, the affidavit and testimony of the complainant, a three-hour interview with the complainant, and the testimony at the *habeas* hearing.

The *habeas* court filed findings of fact and conclusions of law, recommending that applicant's conviction be set aside:

> In making this recommendation that relief be granted, the Court has evaluated this newly discovered evidence in conjunction with an assessment of all the evidence adduced at trial and concluded that this newly discovered evidence has the credibility and strength to cause a verdict of not guilty.

> \* \* \*

> The Court finds that Applicant's ground for relief should be granted and the conviction set aside under authority of *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim.App.1996), in that Applicant has shown by clear and convincing evidence that no reasonable juror would convict him in light of the newly discovered

evidence of actual innocence presented at the evidentiary hearing on Applicant's writ application.

It is clear that the *habeas* court performed the proper analysis of applicant's claim under *Elizondo*, weighing the newly discovered evidence against the evidence adduced at his trial and determining whether any reasonable juror would convict him in light of the new evidence.

We find that the court's findings are supported by the record. The complainant's new affidavit and testimony explains how she was intimidated and manipulated into making the accusations against her father. Her testimony is corroborated in part by the church bus driver's testimony about the torn dress that was put into evidence at applicant's original trial. The complainant's mother's testimony that she did not believe her daughter's original explanation for the torn dress, but chose to seek an explanation that would confirm her suspicions about applicant supports the complainant's testimony about how rest of the "outcry" came about. Presented with this evidence, in conjunction with the "completely normal" results of the medical examination, and the sworn testimony of the complainant that the events in question never happened at all, the *habeas* court's finding that no reasonable juror could have found applicant guilty is supported by the record. Without the finding of guilt, applicant would not have been put in the position, during the punishment phase of the trial, of having to apologize for an offense he did not commit, nor would he have felt the need to "plead the Fifth" in order to avoid perjuring himself on the witness stand.

this rendered his trial counsel ineffective. The court of appeals was correct in holding that an attorney's suspension from the practice of law is not always a *per se* violation of a

defendant's right to counsel. However, in this case it lends support to applicant's claim that his attorney gave him questionable legal advice.

Because we find that the *habeas* court reviewed all the evidence and made findings based on a proper analysis under *Ex parte Elizondo,* and because we believe that those findings are supported by the record, we grant relief. The judgment in cause number W88–67867–U from the 291st Judicial District Court of Dallas County is set aside, and applicant is remanded to answer the charges against him.

Copies of this opinion shall be sent to the Texas Department of Criminal Justice, institutional and pardons and paroles divisions.

COCHRAN, J., filed a concurring opinion in which HOLCOMB, J., joined.

HERVEY, J., filed a dissenting opinion in which KELLER, PJ., and KEASLER, J., joined.

COCHRAN, J., filed a concurring opinion in which HOLCOMB, J., joined.

I join the Court's opinion. I add the following comments to clarify the conceptual framework I think this Court, as the ultimate decisionmaker in the habeas context, should use to evaluate claims of actual innocence.

## I.

First, I agree wholeheartedly with the dissent that our "judicial process is not limitless," but we fail in our primary duty of protecting the innocent and punishing the guilty if we intentionally slam the courthouse doors against one who is, in fact, innocent of wrongdoing. I believe

that if the criminal justice system—even when its procedures were fairly followed—reaches a patently inaccurate result which has caused an innocent person to be wrongly imprisoned for a crime he did not commit, the judicial system has an obligation to set things straight. Our criminal justice system makes two promises to its citizens: a fundamentally fair trial and an accurate result. If either of those two promises are not met, the criminal justice system itself falls into disrepute and will eventually be disregarded.

This Court first crossed over the bridge of addressing post-conviction claims of actual innocence ten years ago in *State ex rel. Holmes v. Court of Appeals for the Third District.*[1] It has not wavered in its basic commitment to permitting an inmate to prove his innocence while enacting a suitably high threshold to weed out the frivolous from the potentially meritorious claims. That commitment was repeated in *Ex parte Elizondo,*[2] *Ex parte Franklin,*[3] *Ex parte Tuley,*[4] *Ex parte Harmon,*[5] and *Ex parte Harvey.*[6]

Almost all of these cases are convictions for aggravated sexual assault of a child, and the factual scenarios are similar. At trial, a young girl[7] testifies that the defendant, usually a stepfather or other close relative, sexually molested her. The child is frequently a reluctant witness and simply agrees with the leading questions asked her. There is usually a divorce or other family dispute involved. There are generally no medical findings of sexual abuse and no physical evidence that definitively points toward molestation. Usually

1. 885 S.W.2d 389 (Tex.Crim.App.1994).

2. 947 S.W.2d 202 (Tex.Crim.App.1996).

3. 72 S.W.3d 671 (Tex.Crim.App.2002).

4. 109 S.W.3d 388 (Tex.Crim.App.2002).

5. 116 S.W.3d 778 (Tex.Crim.App.2003).

6. No. WR–74,955 (Tex.Crim.App., delivered Dec. 8, 2004) (not designated for publication).

7. In *Elizondo,* the child was the applicant's step-son. 947 S.W.2d at 209.

a child psychologist or sex abuse therapist testifies that the child's behavior is consistent with that of a sexually-molested child. There is frequently an "outcry" witness, normally the mother or other female relative, who testifies that the child told her about the abuse.[8] The jury convicts the defendant and he is sentenced to a long prison term.

These are "she said, he said" cases that ultimately rely upon the jury's assessment of the relative credibility of opposing witnesses. In such cases, it is virtually impossible for the jury not to make an occasional credibility mistake. Any parent who has ever attempted to resolve a sibling quarrel based upon "he said, she said" versions of a single event knows that even a parent can, from time to time, make a credibility mistake and believe a child's inaccurate version of the event.

Several years later the child, for various reasons, recants and now says that the defendant never abused her and that, in fact, she was never sexually molested by anyone. Her position now is that she was pressured into making the allegation, that she wanted the defendant out of the house, that she was scared and just went along with what others told her, or that she simply does not recall any untoward sexual behavior by the defendant. Frequently other witnesses now come forward and say that the child had told them at some point—sometimes before the original trial, sometimes after—that the defendant never

---

**8.** In *Elizondo*, the evidence at trial consisted of the following: "perfunctory" testimony by the 10-year-old child that his mother and applicant made him and his younger brother watch sexually explicit videotapes and that both adults sexually molested both boys; outcry testimony by his step-mother and a police officer; and a sexually explicit picture and note written by the child at school. 947 S.W.2d at 209. "No other incriminating evidence was offered or received at trial." *Id.*

In *Franklin*, the evidence at trial consisted of the 13-year-old child's testimony that the applicant raped her in her father's backyard while her father and his girlfriend were inside. 72 S.W.3d at 672–73. The child's parents were divorced and she lived with her mother (the outcry witness) and her stepfather, but frequently visited her father and his girlfriend. *Id.* at 673. The child's mother testified that the day after the child came back from her father's house, the mother found a pair of blood-stained panties in the laundry. Because the child had had her period two weeks earlier and because this blood appeared "fresh," her mother was suspicious. A doctor examined the child and found a rupture in the hymen indicative of "blunt force trauma" and that the injury was consistent with her bleeding at the time of the offense. *Id.*

In *Tuley*, the child testified that applicant was her mother's live-in boyfriend, and that shortly after he moved into their apartment, applicant began sexually molesting her. 109 S.W.3d at 411. The child's mother testified that, about this same time, applicant stopped having sex with her, and the child's behavior changed drastically for the worse. *Id.* When the child told her mother about the abuse, her mother immediately kicked applicant out of their apartment and called the police. A doctor examined the child and found "no physical findings suggestive of abuse at that time." *Id.* at 397. Almost immediately after telling her mother of this abuse, the child admitted to friends that she had fabricated her story to get applicant out of her home. *Id.* at 396. These "friends" did not testify to that fact at the original trial.

In *Harmon*, applicant's eight-year-old stepdaughter testified at trial that applicant had sexually abused her "a bunch of times," but she focused on one day when her mother was at work and she and her brother were at home watching television. 116 S.W.3d at 780–81. She testified that applicant told her to go to the bedroom, then he sexually abused her and gave her money. The mother testified that when she came home that day, she found the brother outside the locked house, and she later noticed that the child had extra money. *Id.* at 781. Again, there was no medical evidence.

Because relief in *Ex parte Harvey* was granted in an unpublished *per curiam* opinion, the specific facts in that case need not be set out and cannot be relied upon as precedent.

molested her. The divorce or family difficulties have been resolved or are no longer an issue. Whatever physical evidence might have been produced at the original trial is now explained away in some innocent fashion.[9]

How is the judicial system supposed to sort this out? Only two hearts and minds will ever know the absolute truth in this scenario and even that may be dubious. If the truth lies in the human heart, rather than a Petri dish or DNA test result, do we simply declare that the judicial system is incapable or unwilling to address the matter? Because the original trial is, quite appropriately, "the main event," should we forbid any reprise, regardless of the persuasiveness of proof? Is there nev-

er a second act to a fundamentally fair first trial? It is the outsider—the purported crime victim—who has created the problem by now claiming that she really was not a victim at all. If the original trial afforded all of the required procedural protections, and if the institutional players—the prosecutor, the defense attorney, the judge, the jury—lived up to their legal, moral, and ethical obligations, should the criminal justice system wash its hands of this dilemma and say, "Bad luck, it's not our fault. Take your problems elsewhere"?

That is one possible, perhaps permissible, legal approach. It is an approach that the United States Supreme Court might uphold.[10] But that is not the approach this

---

9. In *Elizondo*, both children recanted thirteen years after the trial when they were full-grown adults, saying that their natural father "relentlessly manipulated and threatened them into making such allegations against applicant in order to retaliate against their natural mother, his ex-wife, for marrying applicant years before." 947 S.W.2d at 210. They denied that any abuse had ever occurred.

In *Franklin*, the child gave an affidavit to police three years after the trial, saying that she had been abused by her step-father (applicant was a family friend) for approximately ten years until she and her mother moved out and she then went to the police. 72 S.W.3d at 673. She did not, however, recant her trial testimony that applicant had molested her on one occasion. *Id.* at 674. Thus, this Court held that "[a]lthough applicant's [new] evidence is important, it is limited to the impeachment of [the child's] claim that she did not have sexual relations with other men," and we denied habeas relief despite the trial court's contrary recommendation. *Id.* at 678.

In *Tuley*, the trial evidence was, according to the judge, "[r]ife with material contradictions" in which the 12–year–old child victim's testimony "conflicted with testimony given by other State's witnesses or was simply implausible." 109 S.W.3d at 396. The jury also must have had concerns about the evidence because it could not reach a verdict; instead it deadlocked. The child officially recanted two years after giving her trial testimony and

explained that she had fabricated the charges against applicant because she thought he was unfaithful to her mother, that he had abused her mother, and he had used drugs. 109 S.W.3d at 396. She hated him and wanted him out of the house. *Id.* at 420.

In *Harmon*, the child recanted nine years after the trial, testifying at the habeas hearing that her aunt had told her "what to say about the alleged event" so that the child's mother and natural father would get back together again once applicant was "out of the picture." 116 S.W.3d at 780–81.

10. In *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court left open the question of whether a truly persuasive showing of actual innocence could be an independent constitutional basis for federal habeas relief. See *Id.* at 427–429, 113 S.Ct. 853 (O'Connor, J., concurring). *Herrera* was a 6–3 decision. At least three of the concurring justices did not foreclose the viability of actual innocence serving as a free-standing claim for federal habeas relief.

Justices O'Connor and Kennedy did not reach that question; instead, they suggested that the Supreme Court would never have to decide such an issue because any truly persuasive claim of innocence would be resolved by executive clemency. See *id.* at 42, 113 S.Ct. 853 (O'Connor, J., concurring) ("the Court has no reason to pass on, and appropri-

Court has taken. Instead, this Court has attempted to thread the eye of the needle by making a habeas applicant's free-standing claim of actual innocence cognizable, but only if it is supported by newly discovered evidence that "unquestionably establishes his innocence."[11]

This approach has worked remarkably well when the trial court finds the post-trial recantation not credible and recommends the denial of habeas relief. This Court routinely follows the trial court's factual findings, legal conclusions, and recommendation. Those cases are speedily disposed of with *per curiam* orders. This approach has not worked so well in those few instances where the trial judge finds that the recantation is credible, the newly discovered evidence unquestionably establishes the inmate's innocence, and he recommends granting relief. I am aware of only five such cases in the past eight years—*Elizondo, Franklin, Tuley, Harmon* and *Harvey*. This is the sixth. This is not a floodgate of litigation, and our trial judges appear to be quite competent at sorting out the good from the bad.

ately reserves, the question whether federal courts may entertain convincing claims of actual innocence. That difficult question remains open. If the Constitution's guarantees of fair procedure and the safeguards of clemency and pardon fulfill their historical mission, it may never require resolution at all"). In his separate concurrence, Justice White stated that a persuasive showing of "actual innocence" based on newly-discovered evidence could render an inmate's execution unconstitutional. *See id.* at 429, 113 S.Ct. 853 (White, J., concurring).

These three justices did conclude that Herrera's free-standing claim of actual innocence did not establish an independent constitutional claim. *See id.* at 427, 429, 113 S.Ct. 853. First, Herrera's newly-discovered evidence consisted only of affidavits. *See id.* at 417, 113 S.Ct. 853 . Second, the affidavits were made over eight years after the trial. *See id.* at 417–18, 113 S.Ct. 853. Third, the affidavits themselves contained internal inconsistencies. *See id.* at 418, 113 S.Ct. 853. Finally, when the affidavits were considered with the evidence presented at trial—two eyewitness identifications, numerous pieces of circumstantial evidence, and a handwritten letter where Herrera apologized for killing the officers—the evidence still pointed strongly toward the inmate's guilt. *See id.* Thus, the newly-discovered affidavit evidence did not meet the standard of a truly persuasive showing of actual innocence.

Justice Blackmun, speaking on behalf of the three dissenters stated unequivocally: "[n]othing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent." *Id.* at 430, 113 S.Ct. 853 (Blackmun, J., joined by Stevens & Souter, JJ., dissenting) (citations omitted). *See also Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ("[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"). But, as Justice Blackmun correctly noted, the issue before the Supreme Court in *Herrera* was not whether the execution or imprisonment of an innocent person is unconstitutional, the question was whether Herrera had proven he was actually innocent. *Id.* at 432 n. 2, 113 S.Ct. 853. And that, according to six justices, he did not do.

In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), however, a majority of the Supreme Court seemed to assume that a *Herrera*-type, free-standing claim of actual innocence is cognizable because it contrasted that type of claim with *Schlup's* claim of actual innocence which was coupled with a claim of a constitutional violation. *See id.* at 317, 115 S.Ct. 851 ("[i]f there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claim").

11. *Elizondo*, 947 S.W.2d at 209.

## II.

The issue that continues to trouble the Court, however, is the standard of review that *this* Court should employ when reviewing those few actual innocence claims that a trial court has found to be meritorious and for which the trial court recommends relief.

We have held that an applicant raising a post-conviction free-standing claim of "actual innocence" must meet an "extraordinarily high" burden of producing new facts that "unquestionably establish" his innocence.[12] But that does not resolve the issue of *who* decides whether the new facts unquestionably establish the applicant's innocence and by what legal standard. Nor does it resolve the standard by which this Court reviews the convicting court's factual findings or its legal conclusions in this habeas context.

In the normal habeas corpus context, under either article 11.07 or 11.071, we, as a reviewing court, generally defer to the trial court's factual findings.[13] He is "Johnny–on–the–Spot," especially when it comes to judging the credibility and demeanor of witnesses who personally testify

before him in an evidentiary hearing. That judge is certainly in a better position to determine the credibility of a complainant's sworn recantation of prior testimony given in an earlier trial. This is especially true if the same judge heard both the original trial testimony and the "newly discovered" testimony in the habeas hearing. But regardless of whether the trial judge personally views the witnesses testifying live, a reviewing court will defer to the factual findings of the trial judge even when the evidence is submitted by affidavit[14]—that is, the factual finding is based solely upon reading a cold, hard record. It would be extraordinary practice, indeed, for us to routinely defer to a trial court's findings of fact *except* when that trial court finds a complainant's post-conviction recantation credible and true.

The legal question, which we must review *de novo*, is different: does this evidence, viewed in the light most favorable to the trial court's factual findings and credibility determinations, actually demonstrate that the person is "unquestionably innocent" of the crime?[15] In answering

---

**12.** *Ex parte Elizondo*, 947 S.W.2d at 209 (quoting *Schlup*, 513 U.S. at 317, 115 S.Ct. 851).

**13.** *Ex parte Briseno*, 135 S.W.3d 1, 12–13 (Tex.Crim.App.2004) (in habeas context, "we afford almost total deference to the trial judge's determination of the historical facts supported by the record, especially when those fact findings are based on an evaluation of credibility and demeanor. However, if the trial court's ruling is not supported by the record, this Court may reject the findings") (footnote omitted); *Ex parte Franklin*, 72 S.W.3d at 675, n. 5 ("[a]lthough this Court is not bound by the findings of the trial court in post-conviction habeas corpus proceedings, such findings are considered if supported by the record"); *Ex parte Evans*, 964 S.W.2d 643, 648 (Tex.Crim.App.1998) ("[w]hile this Court is not bound by the findings of a habeas judge in a habeas corpus proceeding, where

the findings are supported by the record, they should be accepted by this Court").

**14.** *Manzi v. State*, 88 S.W.3d 240, 242–44 (Tex.Crim.App.2002) (giving great deference to trial court's factual determinations based on affidavits because "a trial court's rulings on questions of purely historical fact have traditionally been given deference even absent credibility determinations"; "the fact remains that it is traditionally the role of the trial court to resolve issues of historical fact, whether or not credibility and demeanor determinations are involved").

**15.** *Elizondo*, 947 S.W.2d at 209 ("if applicant can prove by clear and convincing evidence to this Court, in the exercise of its habeas corpus jurisdiction, that a jury would acquit him based on his newly discovered evidence, he is entitled to relief").

this question, we should consider the trial court's conclusions of law as well as his recommendation, if any, concerning the grant or denial of habeas relief, but it is nonetheless a legal conclusion that this Court, as the final decisionmaker in habeas applications, must make.[16]

First, then, what legal meaning does the phrase "unquestionably innocent" have? In *Elizondo*, we explained that we borrowed this phrase from the Supreme Court's discussion in *Herrera* and *Schlup*.[17] In fact, that phrase is a shorthand rendition of the Supreme Court's discussion of the distinction between a bare claim of innocence and a claim of innocence coupled with one of constitutional error. The pertinent sentence from *Schlup* is: "[i]f there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the ap-

plicant's] innocence."[18] We explained in *Elizondo* that the phrase "unquestionably establishes" means "clear and convincing" proof.[19] That is, under *Schlup*, the federal district court judge hearing the habeas application must be convinced that the new evidence does, by itself, unquestionably establish, that is, prove by clear and convincing evidence, the applicant's innocence.[20] That is the role of the primary factfinder which, on habeas, is the trial judge in either the federal or Texas state system.

But that is not the end of the matter. The "new" evidence which unquestionably establishes the applicant's innocence must be compared to the "old" inculpatory evidence that was offered at the original trial. That evidence was believed by the original jury which had found that the old evidence established the applicant's guilt beyond a reasonable doubt. Under *Elizondo*, that comparison of "old" and "new" is ultimately the responsibility of this Court.[21] Al-

**16.** *See* 43B GEORGE W. DIX & ROBERT DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 45.82 (2d ed.2001) (it is the job of the Court of Criminal Appeals to resolve "all final aspects of decisionmaking in [art. 11.07] cases"); *id.*, § 45.21 ("[w]hile the district courts have a role in the [habeas corpus] process, it is not that of decisionmaker").

**17.** *Elizondo*, 947 S.W.2d at 209. We explained:
> This discussion [in *Schlup*] makes clear that an exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial. Where the trial has been constitutionally error-free, a conviction is entitled to the greatest respect. The habeas court must be convinced that the "new facts unquestionably establish [the applicant's] innocence."
> *Id.* (quoting *Schlup* ).

**18.** *Schlup*, 513 U.S. at 317, 115 S.Ct. 851.

**19.** *Elizondo*, 947 S.W.2d at 209.

**20.** That evidence must suffice as a complete and absolute exoneration of the applicant's

guilt. Newly discovered or newly available evidence that is merely impeaching or supportive of a defensive theory but does not provide a wholly exonerating explanation of actual innocence cannot form the basis of relief under *Elizondo*.

**21.** In *Elizondo*, we stated:
> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial....
> Accordingly, we now hold that, in the exercise of our postconviction habeas jurisdiction under article 11.07 and 11.071 of the Code of Criminal Procedure, our job is not to review the jury's verdict but to decide whether the newly discovered evidence would have convinced the jury of applicant's innocence....
> Consequently, if applicant can prove by clear and convincing evidence to this Court,

though we are greatly aided by the findings of a trial judge, particularly one who has personally heard both the "old" and "new" evidence, it is this Court's responsibility to decide the ultimate legal question of whether a rational trier of fact would *necessarily* acquit the applicant based upon a comparison of the "old" and "new" evidence. That is, a rational factfinder could not simultaneously believe both the "old" and "new" evidence and still reach a guilty verdict.

Of course, because both the burdens of production and persuasion in a habeas application are upon the applicant,[22] he must ensure that the trial court and this Court are capable of comparing the "old" with the "new" evidence. He must produce an adequate record to support his claim for relief; otherwise this Court must deny his claim.[23]

Conceptually, how do both the trial court and this Court go about comparing the "old" and "new" evidence to decide whether a rational jury would necessarily acquit the applicant based upon the impact of the newly discovered evidence of innocence? I suggest the following framework:

* First, the trial court hears the newly discovered evidence. It assesses the credibility of those witnesses and the persuasiveness of that evidence. It makes findings of fact concerning its assessment of that evidence, both individual pieces and collectively.

* Second, the trial court decides whether that "new" evidence "unquestionably establishes" the applicant's innocence. Only if the trial court finds that the new evidence is both credible and, by clear and convincing evidence, that evidence, by itself unquestionably establishes the applicant's innocence, should the trial court continue.

* Third, the trial court compares the "new" evidence with the "old" evidence from the original trial or other proceeding. In doing this, the trial court might envision the situation as if the original jury trial took place all in one morning. At that point the jury believed the State's evidence, returned its guilty verdict and heard

in the exercise of its habeas corpus jurisdiction, that a jury would acquit him based on his newly discovered evidence, he is entitled to relief.
947 S.W.2d at 206–209.

**22.** *See Ex parte Peterson,* 117 S.W.3d 804, 818 & n. 60 (Tex.Crim.App.2003) (per curiam) (defendant bears burden of proving double jeopardy claim by preponderance of evidence on writ of habeas corpus); *Ex parte Kimes,* 872 S.W.2d 700, 703 (Tex.Crim.App.1993) (defendant-applicant bears the burden of proof at a habeas hearing to show a constitutional violation); *see also Ex parte Thomas,* 906 S.W.2d 22, 24 (Tex.Crim.App.1995) ("[t]he burden of proof in a writ of habeas corpus is on the applicant to prove by a preponderance of the evidence his factual allegations").

**23.** From the concurring opinion on the State's Motion for Rehearing in *Ex parte Tuley,* 109 S.W.3d at 402 (Price, J., joined by Cochran, J., concurring), one might get the erroneous impression that a habeas applicant does not have the burden to produce the record from the original trial. *Tuley,* however, involved a deadlocked jury and, ultimately, a negotiated guilty plea, not a conviction obtained after a jury verdict. In that case, the underlying trial record was helpful to the trial court (and to this Court) in comparing the evidence that had been offered at the aborted trial which *did not* persuade a jury beyond a reasonable doubt of applicant's guilt. But, because there was no jury verdict in that case, *Tuley* falls outside the usual parameters of a free-standing claim of actual innocence in which the "old" inculpatory evidence underpining a jury's guilty verdict is entitled to great deference.

all of the punishment evidence. The jury then took a lunch break. Afterwards, that very same jury returned and heard all of the "new" evidence—evidence that the trial court has already found, as a matter of fact, to be credible and establishes innocence—and was asked to render a second verdict after hearing the morning and afternoon testimony. It is only if that jury, acting rationally after hearing *and believing* both sets of evidence, would necessarily acquit the defendant (because the "old" and "new" evidence cannot rationally be reconciled), that the trial court may conclude that the applicant has unquestionably established his innocence of the crime for which he was convicted.

* Fourth, this Court then deferentially reviews the trial court's factual findings concerning the "new" evidence to ensure that those findings are supported by the record. If the factual findings are supported by the record, we then independently compare the "new" evidence as found by the trial court with the "old" evidence in the same manner that the trial court did in step three. The ultimate legal question, which we review *de novo,* is whether a rational jury would necessarily acquit the applicant based upon hearing and believing both the "old" and "new" evidence because they are rationally irreconcilable.

Before an applicant could meet this legal standard, he must show that the "new" evidence satisfactorily rebuts or nullifies all of the State's primary inculpatory evidence from the "old" trial. For example, suppose in the child sexual assault scenario set out above, there was an eyewitness who testified at the original trial that she stumbled upon the child and the applicant *in flagrante delicto.* In that event, the child's "new" recantation, though important, does not unquestionably establish innocence. Or suppose that applicant's DNA was found on the child's private parts. Absent powerful evidence to show an inaccurate test or some wholly-innocent explanation for the DNA, the child's later recantation would not suffice.

Indeed, that failure to nullify the State's primary inculpatory evidence led this court to deny relief in *Franklin* because, even granting deference to the trial court's factual findings, the applicant failed to offer evidence that he was unquestionably innocent. In *Franklin,* the child victim came forward years later and admitted that, in fact, she had been sexually abused for years by her step-father.[24] That abuse would certainly account for her physical injury which was important inculpatory evidence at the original trial. However, the child did not recant her "old" testimony that the applicant, as well as her step-father, sexually molested her.[25] Thus, had she told the full truth at the original trial, the State's evidence would have been less persuasive and the medical evidence virtually irrelevant, nonetheless, a rational jury could still have found applicant guilty based solely upon the child victim's original, unrecanted testimony. This Court did not disagree with the trial court's factual findings in *Franklin*—that the child's "new" evidence was credible and that, as a matter of fact, her step-father had abused her for some ten years—but rather with the legal significance of that testimony when weighed against the credible, unrecanted "old" testimony. The "new" and "old" evidence were not rationally irreconcilable.

24. *Franklin,* 72 S.W.3d at 673.

25. *Id.* at 678.

In sum, both the trial court and this Court have important, overlapping roles in determining whether an applicant has unquestionably established his innocence based on newly discovered evidence. The jury's verdict in the original trial is entitled to great deference, but it is not such a shibboleth that the judicial system is required to turn a deaf ear and close the door against truly persuasive and credible evidence of actual innocence which, had the original jury heard it, would necessarily have acquitted the applicant.

Turning to this particular case, the dissent appropriately notes that applicant's habeas evidence does not rebut every single bit of inculpatory evidence from the original trial. Specifically, the new evidence does not negate the trial testimony of the child's mother about seeing her daughter's unusual bath time behavior after the five-year-old returned from a visit with applicant. The child was "fondling herself" in the bath; her genital appeared "irritated, sore-looking,"; and she was placing objects between her legs and appeared to be masturbating. Such sexual behavior might, in one case, be attributable to inappropriate sexual contact, but it might also simply be indicative of a perfectly normal child exploring her own body and discovering her sensuality in a childlike way. Surely we are not so naive as to conclude that every five-year-old child, male or female, who explores his own body in the bath tub has been sexually abused by an adult.

Second, the dissent points to the fact that applicant, on cross-examination by the State during the punishment phase of the trial, said that he was sorry for what had happened and what he did to the complainant. This testimony, of course, occurred after the jury had found him guilty and was focused on the appropriate punishment. Even the most innocent of men are, at that stage, surely caught on the horns of a dilemma—resolutely maintain your innocence and have the jury punish you more severely for quarreling with its verdict and expressing no remorse, or accept the jury's verdict and responsibility for whatever conduct caused harm and pain to others and ask for mercy. Neither of these paths is without peril, but neither position is necessarily particularly potent proof of either factual innocence or guilt.[26]

At bottom, however, the issue is not whether the newly discovered evidence has rebutted every jot and tittle of the original inculpatory evidence. The issue is whether, believing both the "old" and the "new" evidence, a rational trier of fact could reconcile that evidence and still reach a verdict of guilty. Because I agree that this applicant has made such a strong case of his actual innocence, which the trial judge believed, and which is rationally irreconcilable with the original inculpatory evidence, I join the majority opinion.

---

26. *See Leday v. State*, 983 S.W.2d 713, 723–24 (Tex.Crim.App.1998). In *Leday*, this Court noted:

> The decision whether to testify [at the punishment phase] is made even less voluntary by the cruel trilemma in which the defendant is placed. If the defendant testifies truthfully and admits guilt, *De Garmo* waiver results. If the defendant testifies untruthfully and denies guilt, the consequences are exposure to punishment for aggravated perjury and, of more immediate consequence, an increased punishment on account of the perjury. And if the defendant does not testify, the opportunity is lost for the defendant to give the sentencer information that only the defendant can provide. This would exclude in every case some information that is relevant to two important objectives of the system of criminal punishment: a penalty that will prevent this offender from committing other crimes, and a recognition of the possibility of rehabilitating the individual defendant.
>
> *Id.* (citation omitted).

HERVEY, J., filed a dissenting opinion in which KELLER, PJ., and KEASLER, J., joined.

I respectfully dissent because this Court's evolving "actual innocence" jurisprudence is irreconcilable with and has eviscerated most of this Court's decision in *Ex parte Elizondo,* 947 S.W.2d 202 (Tex. Cr.App.1996).

To date, most "actual innocence" cases have involved an inmate, such as the one here, who has been found guilty beyond a reasonable doubt of committing some type of sexual offense against a child. It is undisputed in these cases that this inmate has been convicted according to due process of law and has been afforded the "unparalleled [constitutional] protections against convicting the innocent" at his error-free trial. *See Herrera v. Collins,* 506 U.S. 390, 398–400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) and at 419–20 (O'Connor, J., concurring). Many years later this presumptively guilty inmate[1] challenges his conviction on habeas corpus on the basis of newly discovered evidence (usually a recantation by the victim) which the inmate claims establishes his innocence.

Society has legitimate finality interests in this presumptively guilty inmate's error-free conviction, and courts should afford these finality interests great weight and respect in evaluating this inmate's free-standing "actual innocence" claim on habeas corpus many years after the fact. *See Elizondo,* 947 S.W.2d at 209 (conviction from an error-free trial is entitled to the "greatest respect"); *Herrera,* 506 U.S. at 400–04 and at 426, 113 S.Ct. 853 (O'Connor, J., concurring). These legitimate finality interests are especially important when one considers that the trial with all of its protections against convicting the innocent is the paramount event for determining, and is the most reliable indicator of, a defendant's guilt/innocence. *See Herrera,* 506 U.S. at 401 and at 419–20, 113 S.Ct. 853 (O'Connor, J., concurring). The passage of time does not enhance and may even diminish the reliability of criminal adjudications. *See Herrera,* 506 U.S. at 403, 113 S.Ct. 853. This Court's evolving "actual innocence" jurisprudence has not adequately taken these legitimate considerations into account.

This Court's "actual innocence" jurisprudence begins with the United States Supreme Court's decision in *Herrera. Herrera* wrestled with the question of whether a free-standing claim of actual innocence based on newly discovered evidence states a basis for federal habeas corpus relief. In an "assuming *arguendo*" opinion, the Court avoided that question altogether because the applicant in that case failed to make a persuasive showing of innocence. *See Herrera,* 506 U.S. at 417 and at 419–27, 113 S.Ct. 853 (O'Connor, J., concurring) (Court "assume[s] for the sake of argument" that free-standing claim of actual innocence is cognizable on habeas corpus), and at 427–30 (Scalia, J., concurring) (no legal error "in deciding a case by assuming, *arguendo,* that an asserted constitutional right exists").

It is very significant that, in deciding whether the applicant made a persuasive showing of innocence, the Supreme Court in *Herrera* considered it necessary to independently evaluate applicant's new evidence and the evidence at his trial. *See Herrera,* 506 U.S. at 398, 113 S.Ct. 853

---

1. *See Herrera,* 506 U.S. at 399–400, 113 S.Ct. 853 (once "a defendant has been afforded a fair trial and convicted of the offense for which he has been charged, the presumption of innocence disappears," and, on habeas, this defendant "does not come before the Court as one who is 'innocent' but, on the contrary, as one who has been convicted by due process of law").

(applicant's actual innocence claim "must be evaluated in the light of the previous proceedings in [the] case, which have stretched over a span of 10 years") and at 418, 113 S.Ct. 853 (considering applicant's new evidence "in light of the proof of [his] guilt at trial") and at 421–24, 113 S.Ct. 853 (O'Connor, J., concurring) (same). The Supreme Court did not leave it solely to the lower courts to perform this task. *See Herrera*, 506 U.S. at 398, 418 and at 421–24, 113 S.Ct. 853 (O'Connor, J., concurring).

This Court's decision in *Holmes v. Court of Appeals* is the first of our actual innocence habeas corpus cases to hold that a free-standing claim of actual innocence is cognizable on state habeas corpus in death penalty cases. *See Holmes v. Court of Appeals*, 885 S.W.2d 389, 397–98 (Tex.Cr. App.1994).[2] It is significant that *Holmes* relied heavily on *Herrera* where the Supreme Court itself independently evaluated the applicant's new evidence and the evidence at his trial. *See Herrera*, 506 U.S. at 398, 113 S.Ct. 853 .

This Court's decision in *Ex parte Elizondo* (a sexual offense against a child case) extended the holding in *Holmes* to nondeath penalty cases. *See Ex parte Eli-*

*zondo*, 947 S.W.2d 202, 204–05 (Tex.Cr. App.1996). But, disregarding *stare decisis* principles, *Elizondo* rejected the standard that the Court had recently adopted in *Holmes*, by which courts (including this Court) should evaluate freestanding claims of actual innocence. *See Elizondo*, 947 S.W.2d at 205–07. The *Holmes* standard that *Elizondo* rejected was essentially the *Jackson v. Virginia*[3] sufficiency standard which *Elizondo* mistakenly claimed was an impossible standard to meet in cases like this.[4] *See Elizondo*, 947 S.W.2d at 205–06 (rejecting the implication in *Holmes* that "actual innocence" test is met "only when newly discovered evidence renders the State's case legally or constitutionally insufficient for conviction"), and at 207 (acknowledging upon further reflection that the *Jackson v. Virginia* standard "is not a suitable standard").

*Elizondo's* new standard, however, still required a habeas applicant claiming actual innocence to make an exceedingly persuasive showing that unquestionably established his innocence and (consistent with *Herrera* ) *Elizondo* still recognized society's valid finality interests in a constitutionally error-free conviction (which *Elizondo* said was "entitled to the greatest

---

**2.** *Holmes*, however, misread *Herrera* as actually holding that federal due process required this. *See id.; but see Herrera*, 506 U.S. at 417, 113 S.Ct. 853 (very carefully pointing out that it was not deciding that question). The "assuming *arguendo* " opinion in *Herrera* made no such holding. Our Legislature, therefore, may alter this Court's decisions in *Holmes* and other "actual innocence" cases since it is clear that the holding in *Holmes* was by judicial fiat unsupported by any constitutional decision by the United States Supreme Court. *See also Elizondo*, 947 S.W.2d at 215–16 (Womack, J., dissenting on reh'g) (holding in *Holmes* erected on "mighty thin sand").

**3.** *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**4.** In his dissenting opinion in *Holmes*, Judge Clinton claimed that the *Jackson v. Virginia* standard was an impossible burden for a habeas applicant claiming actual innocence to meet because "any evidence sufficient to support a jury's verdict beyond a reasonable doubt will also be sufficient to support a rational jury's guilty verdict even after adding the most compelling newly discovered evidence to the mix." *See Holmes*, 885 S.W.2d at 417 (Clinton, J., dissenting). This is incorrect under a proper application of the *Jackson v. Virginia* standard. *See Johnson v. State*, 23 S.W.3d 1, 15–16 (Tex.Cr.App.2000) (McCormick, P.J., dissenting) (describing proper application of *Jackson v. Virginia* standard); *cf. Carmouche v. State*, 10 S.W.3d 323, 332–33 (Tex.Cr.App.2000).

respect"). *See Elizondo*, 947 S.W.2d at 209. The most important thing about *Elizondo* is that (also consistent with *Herrera*) it required **all** courts reviewing actual innocence claims to "assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole" which necessarily involves weighing "such exculpatory evidence against the evidence of guilt adduced at trial." *See Elizondo*, 947 S.W.2d at 206; *see also Herrera*, 506 U.S. at 398, 113 S.Ct. 853 (actual innocence claims "must be evaluated in the light of the previous proceedings in the case"). And (also consistent with *Herrera*), this is exactly what this Court did in *Elizondo*. *See Elizondo*, 947 S.W.2d at 209–10 (this Court weighed the newly discovered evidence with the evidence presented at trial); *see also Herrera*, 506 U.S. at 418–19, 113 S.Ct. 853 .

The next significant decision in our actual innocence jurisprudence is this Court's decision in *Ex parte Tuley* (a sexual offense against a child case).[5] In *Tuley*, the complainant testified at trial that the habeas applicant sexually assaulted her several times.[6] The habeas applicant was convicted of the offense beyond a reasonable doubt (based on a guilty plea while his jury was deadlocked on guilt/innocence).[7] Many years later, the complainant recanted her trial testimony.[8] The applicant filed a habeas corpus application claiming that the complainant's recantation was new evidence that established his innocence.[9] The habeas court weighed the habeas applicant's new evidence of innocence against the evidence of his guilt at trial and recommended that this Court grant applicant relief on his actual innocence claim.[10] This Court granted applicant relief on this claim without independently examining applicant's new evidence and the evidence at his trial, contrary to *Elizondo* and *Herrera*.[11]

The next significant decision in our actual innocence jurisprudence is this Court's decision in *Ex parte Harmon* (another sexual offense against a child case).[12] That case was like *Tuley* except that the habeas applicant was convicted by a jury.[13] But this time the Court granted applicant relief on his actual innocence claim without a clear indication that any court (this Court or the habeas court) independently examined applicant's new evidence and the evidence at his trial, contrary to *Elizondo*, *Herrera* and *Tuley*.

The Court's current view on its evolutionary continuum of its "actual innocence" jurisprudence seems to be that freestanding actual innocence habeas claims are like other habeas claims (in which this Court defers to the habeas court's findings that the record supports) and that this Court's only role is simply to determine whether the habeas record supports the habeas

---

5.  *See Ex parte Tuley*, 109 S.W.3d 388 (Tex.Cr. App.2002).

6.  *See Tuley*, 109 S.W.3d at 411–12 (Hervey, J., dissenting on reh'g).

7.  *See Tuley*, 109 S.W.3d at 407–08, 410–11 (Hervey, J., dissenting on reh'g).

8.  *See Tuley*, 109 S.W.3d at 419 (Hervey, J., dissenting on reh'g).

9.  *See Tuley*, 109 S.W.3d at 419 (Hervey, J., dissenting on reh'g).

10.  *See Tuley*, 109 S.W.3d at 424–34 (Hervey, J., dissenting on reh'g).

11.  *See Tuley*, 109 S.W.3d at 409–10 (Hervey, J., dissenting on reh'g).

12.  *See Ex parte Harmon*, 116 S.W.3d 778 (Tex.Cr.App.2002).

13.  *See Harmon*, 116 S.W.3d at 779 (Hervey, J., dissenting on reh'g).

court's finding that the victim's recantation is credible. This view, however, ignores the jurisprudential foundation of *Elizondo* (i.e., the Supreme Court's decision in *Herrera*) and it is plainly inconsistent with what *Elizondo,* 947 S.W.2d at 206, actually says:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, **our** [14] task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, **we** [15] must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial. . . .
>
> Of course, any person who has once been finally convicted in a fair trial should not be permitted to wage, and we do not permit him to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent. It is thus entirely reasonable to insist, and we continue to insist, that an applicant for habeas relief based on a claim of actual innocence must "demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different [on retrial]."
> . . . [16]

The Court's current view that its only role in reviewing *Elizondo* claims is to determine whether the habeas record supports the habeas court's finding that the victim's recantation is credible ignores the fact that the record also supports the other factfinder's (i.e., the jury's) verdict in applicant's error-free trial, usually based on more than the testimony of the complaining witness.[17] These twelve factfinders heard live all of the evidence presented at the applicant's error-free trial during which they also observed the victim testify. After all of this, these twelve factfinders convicted the applicant beyond a reasonable doubt at this error-free trial which many consider to be the most reliable indicator of the applicant's guilt. *See Herrera,* 506 U.S. at 403–04 and at 419, 113 S.Ct. 853 (O'Connor, J., concurring). This finding that applicant is guilty is entitled to as much, if not more, deference than that afforded by this Court to the habeas court's findings many years after the fact. In treating *Elizondo* claims like other habeas claims, the Court shows no respect at all for an error-free conviction and transforms the applicant's error-free trial into an insignificant non-event. *But see Herrera,* 506 U.S. at 401, 113 S.Ct. 853 (the original trial is "a decisive and portentous event"); *Elizondo,* 947 S.W.2d at 202. In the final analysis, there really is no guarantee that the habeas determination of the applicant's guilt/innocence many years after the fact is any more reliable than the determination made at his error-free trial, and there is good reason to believe that the former is even less reliable than the latter. *See Herrera,* 506 U.S. at 401, 403, 113 S.Ct. 853 (passage of time only diminishes the reliability of later criminal adjudications).

No one disputes that our "actual innocence" habeas corpus jurisprudence is well-intended to prevent the imprisonment

---

**14.** Emphasis supplied.

**15.** Emphasis supplied.

**16.** This is very different from our usual role in other habeas cases.

**17.** This is the error-free trial that *Elizondo* states is entitled to the greatest respect. *See Elizondo,* 947 S.W.2d at 209.

of innocent people. But good intentions are not enough.[18] Our current actual innocence habeas corpus jurisprudence is inconsistent with *Herrera* (which *Holmes* and *Elizondo* claimed to follow) as well as our decision in *Elizondo* requiring that all courts evaluate actual innocence claims by, at the very least, comparing and weighing the new evidence against the evidence at trial. *See Herrera*, 506 U.S. at 398, 113 S.Ct. 853 (evaluating applicant's actual innocence claim "in the light of the previous proceedings in [the] case, which have stretched over a span of 10 years").

By no longer requiring courts to do this, our current actual innocence habeas corpus jurisprudence ignores the most reliable indicator of guilt (the applicant's trial), affords no consideration whatsoever to society's legitimate finality interests and is contrary to *Elizondo's* claim that an error-free conviction is entitled to the greatest respect. *See Elizondo*, 947 S.W.2d at 209. This well-intentioned jurisprudence has evolved into a possible "get out of jail free card" for child molesters who pressure their victims to recant their trial testimony and persuade habeas courts to believe these recantations without any consideration of the evidence at trial. *See Elizondo*, 947 S.W.2d at 215–16 (Womack, J., dissenting on reh'g) (an applicant is now "allowed and encouraged to pursue the witnesses and get them to recant" and "[w]hat could be weaker than the evidence of a recanting witness, whose testimony is always, 'The last time I was on the witness stand I didn't tell the truth' "?).

In this case, applying the plain holding of *Elizondo* by independently weighing the new evidence "against the evidence of guilt adduced at trial," [19] this Court should conclude that applicant has not met his burden of unquestionably establishing his innocence.[20] The record reflects that applicant was convicted of aggravated sexual assault of a child in 1991 based in part on the complainant's trial testimony that applicant committed this offense during her visitation with applicant. Many years later in this habeas proceeding, the complainant recanted her trial testimony shortly after meeting with members of applicant's family.

The record from applicant's 1991 trial, however, reflects that the complainant's mother testified that, immediately following the visitation with applicant, the complainant complained "all night that night that her genitals were sore and that it hurt when she urinated." The complainant's mother also testified that, when she bathed the complainant, she noticed "her genital area was all irritated, sore-looking." She also testified that the five-year-old complainant exhibited "strange characteristics" such as masturbating and fondling herself:

Q. What was she doing?

A. She would place objects between her legs like toys, blankets, different

---

18. As Winston Churchill said, "the road to hell is paved with good intentions."

19. *See Elizondo*, 947 S.W.2d at 206.

20. Before a habeas court may grant habeas relief on a freestanding actual innocence claim, *Elizondo*, 947 S.W.2d at 209, requires that the habeas court must be convinced that the applicant has met his burden to "unquestionably establish" his innocence:

This discussion makes clear that an exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial. Where the trial has been constitutionally error-free, a conviction is entitled to the greatest respect. The habeas court must be convinced that the "new facts unquestionably establish [the applicant's] innocence."

things and it would appear to me she was masturbating.

Q. She would rub them between her legs?

A. Yes.

Q. Anything else she was doing that was unusual?

A. Fondling herself.

Q. Anything else you recall?

A. She would cry in the middle of the night for no reason, just cry for no reason. And I didn't understand why she was doing it.

Q. This was when visitation was still going on with [applicant]?

A. Yes.

None of this evidence was recanted at the writ hearing.

Applicant testified at the punishment phase of his 1991 trial. He admitted that he had received probation for "exposing his genitals"and that he had told the police that he had exposed himself on numerous occasions. More importantly, applicant admitted his guilt for this offense and specifically stated:

Q. You just told this jury that you were truly sorry for what happened, what you did to [the complainant], didn't you?

A. Yes, that's correct.

Q. And yet you just sat up there and said you have no love in your heart for [the complainant], didn't want to establish any sort of relationship with her and yet you were the one who victimized [the complainant], weren't you?

A. If I did have anything to do with my daughter, they would come back and say—

Q. That's not what I asked you, [applicant]. You were the one who victimized [the complainant], your five-year-old daughter at the time?

A. I want to plead the Fifth on that.

[THE COURT]: Answer the question.

[THE WITNESS]: Could she repeat it, please?

Q. You were the one who victimized your daughter when she was five years old and you just sat here and told the jury that you were truly sorry for what happened?

A. Yes.

An independent examination of applicant's trial record reveals that applicant has not met the *Elizondo* standard of unquestionably establishing his innocence of the offense for which he has previously been convicted beyond a reasonable doubt. I, therefore, respectfully dissent.