WR-36,864-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/26/2015 3:52:22 PM
Accepted 5/26/2015 4:15:27 PM
ABEL ACOSTA
CLERK

IN THE COURT OF CRIMINAL APPEALS

FOR THE STATE OF TEXAS

EX PARTE

NO.  WR-36,864-2

FRANCES KELLER

---

## SUGGESTION FOR RECONSIDERATION
## ON THE COURT'S OWN INITIATIVE

---

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, Keith S. Hampton, Petitioner in the above-entitled cause, and respectfully suggests that this Court reconsider that portion of this Court's decision handed down May 20, 2015 denying relief on Applicants' claims of innocence.[1]

This case has a legal, historic significance.  Applicants' convictions were the clear product of a period of hysteria now identified as the "Daycare Panic" or the "Satanic Panic."  *See, e.g., Satanic Panic and Defending the West Memphis Three: How Cultural Differences Can Play a Major Role in Criminal Cases*, 42 U. Mem. L. Rev. 1061 (2012); *Paranoid Parents, Phantom Menaces, and the Culture of Fear*, 2000 Wis. L. Rev. 519 (2000). Texas was not spared, as this case demonstrates.  *See,*

---

[1]  Rule 79.2(d) of the Texas Rules of Appellate Procedure provides that a motion for rehearing an order that denies relief to an 11.07 Applicant may not be filed.  The Rule also says this Court "may on its own initiative reconsider the case."  This Court granted Applicant relief on the false evidence claim, but denied all other claims.  The purpose of the rule appears to be addressing the scores of post-conviction writs wherein all relief is denied.  If this interpretation is correct, then Applicant can file a motion for rehearing, and this Court should therefore construe this pleading to be a motion for rehearing.

*e.g., Children in the War on Crime: Texas Sex Offender Mania and the Outcasts of Reform*, 42 S. Tex. L. Rev. 781 (2001). Such periods of profound neurosis appear throughout human history and will appear again in the future. This case presents an opportunity for this Court to recognize the impact of these episodes on the administration of criminal justice so that it is known in law.

One of the central purposes of judicial analysis and the publication of those analyses for bench and bar is to memorialize into the body of law those events likely to be repeated. Judicial opinions are the primary method by which this branch of government ensures we know our history so that we do not doom ourselves to its fruitless or injurious repetition. This Court should reconsider its decision regarding Applicants' innocence claims and conduct a full examination of the record in this cause so that future generations may benefit from this experience. If the life of the law is experience, as Justice Holmes so famously declared, then law is invigorated by a detailed review of this case. Holmes, *The Common Law* (1881).

In this case, investigators and others were swept up in the hysteria of the times so fully that they scoured the records of at least eight airports searching for a mythical airplane which could land in a residential neighborhood, kidnap children from daycare, deposit them in Mexico where they were molested, then return them with no one noticing. Police equipped a helicopter with an infrared camera and flew over at

least eleven cemeteries in search of sites of human sacrifice. They searched everywhere and investigated everyone even remotely suspected of nefarious, supernatural activities. While detectives investigated other detectives, parents – with police participation – took four-year-old children to various cemeteries across Travis County and encouraged them to roam around gravesites in an effort to identify satanic activities.

The facts of this case demonstrate how fully an episode of mania can envelop even intelligent, educated people. This recurring psychological phenomenon can produce devastating consequences in the criminal justice system, as it did for the Kellers. This Court should recognize it now and publicly identify it through a published opinion to inform future courts, prosecutors and lawyers. When the next hysteria blows through the criminal justice system, there will at least exist a benchmark in Texas law.

The proof of the Kellers' innocence is overwhelming. There is nothing in the trial court's findings of fact that would preclude this Court from recognizing the reality of their innocence and granting relief on that basis. Central to our system of justice is the identification, protection and exoneration of the innocent. Rather than ignore the clear and convincing evidence of their innocence, this Court should embrace the task of a full and fair consideration of the proof in this case.

3

The prosecution of the Kellers began with a three-year-old girl's "outcry." She immediately recanted, then at trial refused to maintain any accusation against the Kellers. The conviction of the Kellers instead rested on (1) two believers in satanic goings-on, the girl's mother and therapist; (2) police investigation of the magic plane and other-worldly mischief in Travis County cemeteries; (3) a crackpot "expert;" (4) patently unreliable child testimony; and (5) a ridiculous "confession" from a witness who had immediately and has forever renounced it. The Kellers' convictions are based in precisely the sort of evidence condemned in law as unreliable and well-known to result in the convictions of innocent persons.

Against this barren proof of guilt are the expert evaluations of Fran and Dan Keller which reveal both are normal and do not in any way fit the profile of pedophiles. Both have repeatedly passed polygraphs. The top experts in the world identify this case as the product of the panic of the times. The consideration of all this evidence will lead every judge on this Court to only one conclusion – Fran and Dan Keller are innocent.

The child, C.C., was at the daycare for just thirteen times the summer of 1991, from May 8th to August 15th. Long before she ever attended Applicants' daycare, C.C. was exhibiting bizarre behavior. C.C. had been biting her mother and others, defecating and urinating in the backyard, eating out of a bowl, and licking herself like

4

a cat or dog. She once tried to jump out of a moving car and repeatedly bruised herself by banging her body on the floor.

The "outcry" was made to two people: her mother, Suzanne Chaviers, and a barely-licensed therapist, Donna David-Campbell. C.C.'s mother had a psychiatric history, was a believer in satanic activities, and had been seeing a chiropractor who also acted as her shaman. A year earlier during her divorce, she had C.C. examined for sexual abuse (none was found). The divorcing parent believed that the false accusations against the Kellers could easily have been made against him.

The therapist was a believer as well, convinced in the truth of corpse abuse at cemeteries by children wearing robes. She believed the children were handcuffed or holding candles, conducting animal sacrifices and drinking blood. The rituals, she reckoned, were choreographed by adults dressed as pumpkins or werewolves. She stressed her belief in the reality of these events during her testimony.

The therapist was also grossly incompetent and unethical as well. David-Campbell took and failed the social work exam to become a licensed therapist in 1986. In 1987, she flunked three more times. She flunked yet again in 1989. After six attempts over four years, she barely passed by two points and finally obtained her social work license in 1990. Pursuant to state law, she could only provide therapy under supervision. Yet on May 21, 1991, she became C.C.'s therapist with no

5

supervision whatsoever, in full violation of licensing regulations. In light of her strong advocacy of the reality of satanic activities, this therapist not only needed supervision, but perhaps some genuine, competent and professional therapy herself.

On August 15th, on the way to David-Campbell's office, C.C. told her mother that Dan Keller pulled her pants down and spanked her, and that he had "poo'd and pee'd" on her head. She soon changed her story by the time she arrived to David-Campbell's office. There, with help from David-Campbell, C.C. said that Dan Keller had repeatedly inserted a pen into her vagina and that he had assaulted her vagina with a belt on Saturday and Sunday.

There is no medical or physical evidence of any such trauma to her vagina, and the attendance records revealed that she was never at the daycare on any weekend. When David-Campbell asked if anyone washed her hair, the girl said, "Fran." Then C.C. promptly said none of it ever happened.

C.C. was taken to Dr. Mouw for an examination that this Court now knows resulted in a mistaken but crucial identification of a normal hymen for a lacerated one. Henceforth, all investigators proceeded with the confidence that a medical specialist had confirmed the reality of ritual abuse and the child's own account. C.C.'s claims, despite her immediate recantation, were regarded as having been corroborated by hard evidence.

6

The next day, C.C. was taken to be interviewed by Karen Knox, a social worker who worked at the sheriff's office as a video specialist videotaping alleged child sexual abuse victims. No one knew the doctor was wrong. Knox, proceeding under the assumption C.C. had indeed been molested, dedicated herself to eliciting the details of C.C.'s assumed abuse.

The ensuing interviewing techniques Knox employed were appalling. The interrogation of the children in this case is so fraught with error, they are considered by law enforcement to be the exemplar of how *not* to interview children. She took anatomically correct dolls, stripped them, then touched, poked and rubbed the dolls together for C.C. Knox helpfully named the dolls "Dan" and "Fran."

She and C.C.'s mother promised her candy for "correct" answers and interrogated her relentlessly with suggestive questions and remarks. At one point, Knox asked about what "Danny did to [C.C.] at the day care center," and C.C. replied, "You tell me." When C.C. tried to leave, she was restrained. The techniques employed in these child interviews are now universally condemned – a fact that ought to be recognized in a published opinion from this Court.

Eventually, after extensive "therapy," C.C. became a fountainhead of ornate, bizarre accusations. The Kellers shot Easter bunnies and made her smoke a cigarette. The Kellers dismembered babies at the daycare. Tigers licked the children, then they

7

were killed. The Kellers "had everyone take off their clothes and had a parrot that pecked them in the peepee." And on and on.

Throughout C.C.'s "therapy," another child, B.N., was also being subjected to the same treatment. His parents, convinced of C.C.'s claims and that District Attorney Ronnie Earle was part of a satanic cult, showed him satanic symbols and quizzed him at home. The police and the boy's therapist were equally inquisitive. After eight months of questions and suggestions, B.N. at last produced some wild stories of his own after he announced to his therapist, "I know how to bring in Satan."

B.N. became the prosecution's star child witness, C.C. having been less than cooperative. From a closed-circuit screen and clutching a teddy bear that he claimed was alive and could talk, B.N. told how the Kellers took him to a graveyard and dug up a body with a cave-making machine, forced C.C. to carry bones, and sucked up dirt into an 8-foot tall bag. After forcing B.N. and other children to stare at the sun, Dan Keller abused him. B.N. also said he could count to a thousand and saw C.C. ride a pony 118 times.

B.N. also produced new satanic suspects, namely, "bad sheriffs," a man and woman. His claims would eventually lead to the investigation of a wide variety of law enforcement personnel. During a photo line-up, B.N. picked out a female constable, Janise White. The detective showed B.N. a photo of Deputy Roger Wade,

8

the detective's collaborating investigator. B.N. said, "Her wife. It's her husband." The detective refused to believe B.N. actually meant Deputy Wade, so he reasoned that the child must have meant White's ex-husband, Doug Perry, who was a friend of the Kellers. Under this hasty, distorted rationale, Wade was instantly cleared and Perry instantly a suspect.

In an unrecorded 4½-hour interrogation by Texas Rangers, Perry ultimately signed a confession to a lurid orgy in which the Kellers and others sexually abused the children. He also claimed the orgy was recorded on film. He then retracted the confession at the first available opportunity.

Perry did not spontaneously or independently recount the details of his confession. Instead, he relied on police reports as a guide for his factual assertions during his interrogation. Perry said nothing about ritual abuse in the course of his false confession. No child ever mentioned or identified Perry. His story does not match any particular story of any child. Nevertheless, Perry was forced under threat of contempt to read his confession at the Kellers' trial as proof of their guilt. He did, under protest and with his sworn assertions of their innocence and the falsity of his confession.

Finally, self-professed ritual abuse "expert" Randy Noblitt confirmed that C.C. was in fact the victim of abuse. Noblitt has long enlisted himself in the exposure of

9

an alien Jewish/demonic interplanetary plot to conduct thousands of human sacrifices and enslave humanity through various governmental agencies. If in doubt, the Court may look to the other crackerjack "expert" speakers Noblitt still sponsors at his yearly seminar. They include a former warlock; an expert on the vast, secret child-slave auctions held in Las Vegas, Nevada; and a "beta sex slave" who was forced to have sex with former presidents Jimmy Carter, Ronald Reagan, George H.W. Bush and Gerald Ford. The judges of this Court can also purchase Noblitt's book, published shortly after his outstanding performance in the Kellers' trial. It sells today for $32.50 on Amazon.com.

No one saw anything at all regarding the Kellers' supposedly abusive daycare – not the landlord, the next-door neighbor, none of the parents. There was no trace of any evidence of any criminality, no Polaroid camera, no sex videos, no kidnapping sites, no ritual robes, no blood, no mutilated animals or babies, no invisible suburbia-landing planes. Recent DNA testing on the girl's clothes revealed nothing. All that remains as "proof" are the fantastical stories – woven not so much by children as through them, originating from adults swept up in hysteria. The stories are not child fantasies. The imagery is the stuff of adult anxieties.

Since their convictions, Fran and Dan have undertaken multiple polygraph examinations and passed them all. The polygraph evidence in this case was

introduced without objection for the limited purpose of establishing a statistical probability regarding their truthfulness. The likelihood the exams were passed because the Kellers are innocent is over 90%. If Doug Perry's passed polygraphs are taken into account, the statistic grows to 98%. By any measure, this evidence is strong statistical proof of their innocence, as Petitioner has detailed in this record.

The psychological examinations confirm their innocence. (Reports of Maria Mollett and Matthew Ferrara). Dan and Fran are normal people and neither fits the profile of a pedophile whatsoever. These experts are the same people the State relies upon to determine the release and supervision of identified "sex offenders." These experts independently cleared the Kellers without reservation.

The top experts in the world have weighed in on this case, from the University of Cambridge, Cornell University, City University, London, Maastricht University, The Netherlands, Johns Hopkins University School of Medicine, University of Leicester and the National Institute of Child Health and Human Development – ultimately eighteen very well credentialed experts in all. Their collective conclusion: the convictions of Fran and Dan Keller were "clearly a manifestation of the nation-wide Abuse Panic of the 1980s and 1990s." This Court should recognize this expertise and their informed conclusions.

A review of the evidence in this case will leave no one on this Court with

11

anything less than a conviction of their innocence. Their innocence claims demand review because our criminal justice system makes a fundamental assurance that it will not tolerate the conviction or punishment of an innocent person:

> [I]f the criminal justice system—even when its procedures were fairly followed—reaches a patently inaccurate result which has caused an innocent person to be wrongly imprisoned for a crime he did not commit, the judicial system has an obligation to set things straight. Our criminal justice system makes two promises to its citizens: a fundamentally fair trial and an accurate result. If either of those two promises are not met, the criminal justice system itself falls into disrepute and will eventually be disregarded.

*Ex parte Thompson*, 153 S.W.3d 416, 421 (Tex.Crim.App. 2005) (Cochran. J, concurring). Judge Johnson's concurring opinion reflects why this Court still has promises to keep. *Ex parte Fran Keller*, No. WR-36,864-2, delivered May 20, 2015) (Johnson, J., concurring).

When a convicted person asserts the evidence was insufficient to support a verdict of guilt, the reviewing court is bound to address that question in full. *Hooker v. State*, 621 S.W.2d 597 (Tex.Crim.App. 1981). Yet when that same person insists he or she is actually innocent, such a claim may be summarily disposed with nothing more than a noun and a verb. It does not matter whether the trial court found the person "unquestionably innocent" or not. *See, e.g., Ex parte Castillo*, No. AP-75,460 (Tex.Crim.App., delivered June 21, 2006) (unpublished) (granting relief only on

12

*Brady* violation, wholly ignoring trial court's finding that applicant was "unquestionably innocent"). Under this Court's jurisprudence, fairly convicted guilty people are entitled to greater due process than people who have proven themselves innocent. The guilty receive full judicial review of all the evidence in its totality, while the innocent get nothing more than the sort of page-and-a-half shrug this Court gave the Kellers in this case. *Ex parte Castillo, supra* (three short paragraphs, one page, innocence finding ignored). Petitioner suggests this Court end this indefensible anomaly by addressing the Kellers' innocence claims with at least the same vigor and thoroughness as sufficiency claims brought by people who have been fairly determined to be guilty.

The Kellers deserve more than an unpublished *per curiam* opinion which merely recognizes the obvious unfairness of the proceedings against them. They deserve to have their innocence vindicated with the finality and fullness only the judges of this Court can in good conscience provide. The law needs a better resolution than this Court's current judgment. Justice has yet to be served.

Respectfully Submitted,

KEITH S. HAMPTON
Attorney at Law
1103 Nueces Street
Austin, Texas  78701
keithshampton@gmail.com
TEL: (512) 476-8484
FAX #: (512) 477-3580
CELL: (512) 762-6170
SBN: 08873230

**CERTIFICATE OF SERVICE**:  I, Keith S. Hampton, hereby certify that a true and correct copy of the foregoing *Suggestion for Reconsideration on the Court's Own Initiative* was delivered electronically to the Travis County District Attorney's Office to Scott.Taliaferro@traviscountytx.gov on this day, May 28, 2014.

KEITH S. HAMPTON

14